619 P.2d 1130

HIDDEN SPRINGS TROUT RANCH, INC., a corporation, Plaintiff–Appellant,

v.

HAGERMAN WATER USERS, INC., a corporation, Louis Koopman and Oscar Anderson, Defendants–Respondents.

No. 12994.

Supreme Court of Idaho.

Sept. 29, 1980.

Rehearing Denied Dec. 15, 1980.

678

Lloyd J. Webb of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiff–appellant.

John T. Lezamiz of Hepworth, Nungester & Felton, Buhl, for defendants–respondents.

BISTLINE, Justice.

Involved here are competing rights to the waters arising from springs located on land owned by plaintiff–appellant Hidden Springs Trout Ranch, Inc. (hereinafter "Hidden Springs"). Defendant–respondent Hagerman Water Users, Inc. (hereinafter "Hagerman") has a decree to the water dating back to 1906, and owns and operates diversion works which conduct the water to the lands of its shareholders. Two distinct problems have arisen with regard to the use of this water: (1) Hagerman repaired its diversion works in 1976, causing a spring located on Hidden Springs' land (known as "Spring A") to dry up; and (2) the parties signed an agreement in 1971 governing Hidden Springs' right to use water from the system during the winter. Hidden Springs claims that the agreement has been violated, and brought suit in the court below to enjoin Hagerman from interfering with both Spring A and Hidden Springs' rights under the 1971 agreement. Following trial, the district court dismissed Hidden Springs' complaint, finding Hagerman within its rights as senior appropriator of the water. Finding no error, we affirm.

I. *Spring A.*

Hagerman's water originates in two springs on a talus slope above Billingsly Creek; absent diversion the water would flow downhill into the creek. Around the turn of the century Hagerman constructed two ditches to collect the water from the two springs and channel it to a siphon pipe. The upper ditch, which carries water from the upper spring, is open; the lower ditch, which transports water from the lower spring, is open at the collection point near the spring, but through most of its length the collected water flows through a 15 inch steel pipe. Both ditches channel the water into a siphon pipe, which then carries the water over Billingsly Creek to lands owned by Hagerman's shareholders.

Until 1976 the 15 inch pipe from the lower ditch emptied into another open ditch 238 feet in length, which then joined the upper ditch. Enough water seeped from the 238 foot ditch by percolation so that another spring formed below it. Water from this spring was diverted by Hidden Springs since before 1969 and has become known as "Spring A." Hagerman throughout the years attempted to reduce the seepage from the lower ditch by various means. In July of 1976, when Hagerman installed 20 inch steel pipe in the 238 foot section, the seepage loss was eliminated and Spring A dried up.

Hidden Springs claims to have acquired a right to the water in Spring A, and urges that the trial court erred in refusing to restrain Hagerman's recapture of it. While Hidden Springs concedes that the 1906 decree is prior in time to any claim Hidden Springs has made to the water in question, it challenges Hagerman's status as senior appropriator.

First, Hidden Springs argues that the water constituting Spring A was never successfully diverted by Hagerman, and therefore could not have been included in the 1906 decree. Based on the record, we do not find this argument persuasive. Diversion is a prerequisite to appropriation of water, along with the application of such water to a beneficial use, but diversion as such has not been defined. For example: "The test of a valid appropriation of water is its diversion from the natural source and its application to a beneficial use." *Sarret v. Hunter,* 32 Idaho 536, 541, 185 P. 1072,

1074 (1919). "It is generally held that to constitute a valid appropriation of water there must be a bona fide intent to apply it to some beneficial use, existing at the time or contemplated in the future, followed by diversion from the natural channel by means of a ditch, canal, or other structure and also an active application of the water, within a reasonable time, to a beneficial use." 78 Am.Jur.2d *Waters* § 321 (1975) (footnotes omitted). I.C. § 42–101 provides that the "waters of the state, when flowing in their natural channels," are subject to appropriation. *See also Rabido v. Furey*, 33 Idaho 56, 190 P. 73 (1920). It is Hidden Springs' contention that the diversion necessary for appropriation must be from the natural *source* of the water, and that here the spring field is the natural source, including both Spring A and the springs from which the water first emerged. Since the water never left the spring field, Hidden Springs argues the water was never diverted. In considering this contention, we rely upon those cases which refer to diversion from the natural *channel* of the water, making it sufficient, for establishing diversion, that the water flows in a different channel than it would have done absent intervention by the appropriator.

Here, there can be no dispute that Hagerman did divert the water from its natural channel; instead of running downhill directly into the creek, the water entered a pipe and traveled approximately one–half mile before the water here in dispute was lost as seepage and re–emerged as Spring A. There can be no question but that had Hagerman made use of the water at the point of the seepage loss, it would have been considered diverted for purposes of appropriation.

Hidden Springs also contends that Hagerman never put the water which seeped from the lower ditch to a beneficial use. It argues that the seepage was waste water, and that since the water has been allowed simply to escape back to the creek, it could not be said to have been put to a beneficial use. However, it has long been settled law in Idaho that a senior appropria-

tor of water retains his right to surface waste and seepage water, and may reclaim it, even though such water has been used by a junior appropriator, even for as long as forty years. *Colthorp v. Mountain Home Irr. Dist.*, 66 Idaho 173, 157 P.2d 1005 (1945). In *Colthorp* the senior appropriator used his water to irrigate very porous soil. Approximately 75% of the water returned by seepage to Canyon Creek, from which point it was used by the junior appropriator. After the senior appropriator changed his point of diversion, the seepage ceased. The junior appropriator sued to enforce his claimed right to the seepage water. The trial court's denial of relief to the junior appropriator was affirmed on appeal:

"It is true, as contended by appellant, and as will have been observed, the right to appropriate seepage water is recognized, still and nevertheless, in construing these sections in *Sebern v. Moore*, 44 [Idaho] 410, 416, 417, 418, 258 P. 176, [178] this court held 'surface waste and seepage water may be appropriated ... *subject to the right of the owner to cease wasting it, or in good faith to change the place or manner of wasting it, or to recapture it, so long as he applies it to a beneficial use.*' (Emphasis ours)." 66 Idaho at 179, 157 P.2d at 1007.

Hidden Springs acknowledges this general proposition–that a senior appropriator may reclaim "waste water" which until that point had been used by a junior appropriator–but attempts to draw a distinction between different kinds of waste water. According to Hidden Springs, the waste water in *Colthorp* was runoff or seepage which resulted from irrigation. In the present case, however, the water was lost *en transit* before reaching the point of use. As noted by the trial court, this is an ingenious distinction, but no support is found for it in the case law. In fact, case law indicates that the opposite is true; that no distinction is to be drawn between waste water appropriated after it has been put to irrigation use and waste water seeping from irrigation canals. *See Bower v. Big Horn Canal Assoc.*, 77 Wyo. 80, 307 P.2d 593

(1957). Moreover, it would be difficult to establish such a precedent on the basis of public policy. No appropriator of waste water should be able to compel any other appropriator to continue the waste of water which benefits the former. *Crawford v. Inglin*, 44 Idaho 663, 258 P. 541 (1927). While the waste of the original appropriator is not to be encouraged, the recognition of a right in a third person to enforce the continuation of waste will not result in more efficient uses of water.

The rule instead has been that some loss of water through seepage or evaporation is considered a prerogative of the appropriator, so long as the loss is reasonable. *Glenn Dale Ranches v. Schaub*, 94 Idaho 585, 494 P.2d 1029 (1972). The senior appropriator retains his right to all of the water, including that which is lost through reasonable seepage, and thus may reclaim it, for instance, by improving his transmission system. It is clear from the trial court's memorandum opinion, which also served as its findings of fact and conclusions of law, that the amount of waste occurring prior to Hagerman's installation of the pipe was found to be reasonable:

"[I]n the Glenn Dale case [*supra*] the Supreme Court recognized that an appropriator's right included the right to a reasonable amount of water to get the water to its point of use.

"In this case, the defendants have for years constructed various ditches, etc., to capture the water for which they had a prior right. There was always seepage until the 1976 pipe line. *This is not a case of a negligently maintained diversion system.*

"I.C. Sections 42–1202 and 42–1203 requires the construction of ditches to prevent the wasting of water. I.C. 18–4302 declares it a misdemeanor to waste irrigation water. The legislature has declared a policy *which the defendants complied with.*" (Emphasis added.)

These findings irrefutably show that the trial court believed the amount of seepage from Hagerman's ditch prior to installation of the pipeline was reasonable under the circumstances. It is axiomatic that the factual findings of the trial court will not be overturned on appeal where they are supported by substantial and competent evidence, even though such evidence may be conflicting. *Thompson v. Fairchild*, 93 Idaho 584, 468 P.2d 316 (1970); I.R.C.P. 52(a). The record contains substantial and competent evidence concerning the nature of the Hagerman diversion works from which it could have been concluded that the seepage from such works was reasonable; additionally we note that there was a court view of these works at a time when they were actually transporting water. We find no error in the determination of the trial court that the amount of waste resulting from Hagerman's diversion was reasonable, and that Hidden Springs had no right which precluded Hagerman from recovering that waste.

Hidden Springs argues in the alternative that the waters forming Spring A were abandoned or forfeited by Hagerman. This Court has frequently stated that "[f]orfeitures are abhorrent and all intendments are to be indulged against a forfeiture." *Application of Boyer*, 73 Idaho 152, 159, 248 P.2d 540, 544 (1952). This Court also stated in *Thompson v. Bingham*, 78 Idaho 305, 302 P.2d 948 (1956), that "as against the original appropriator and owner, an adjoining land owner cannot acquire a prescriptive right to waste or seepage water." *Id.* at 308, 302 P.2d at 949–50.

There is a distinction in Idaho law between abandonment and forfeiture. Abandonment requires the proof of intent to abandon along with a showing of actual relinquishment or surrender of water rights. *Gilbert v. Smith*, 97 Idaho 735, 552 P.2d 1220 (1976). Forfeiture, on the other hand, is based on the statutory provision that water which is not put to a beneficial use for five years reverts to public ownership, and may be appropriated. I.C. § 42–222(2).

The parties stipulated to the fact that over the years Hagerman had tried repeatedly to reduce the seepage loss from

the open ditch. These efforts culminated in the placement of the steel pipe referred to above. It is clear from the stipulated facts that Hagerman never intended to abandon the water forming Spring A. Absent such intent, no abandonment can be found. *Gilbert v. Smith, supra.*

 In order to establish forfeiture, Hidden Springs had to show that the water was not put to a beneficial use for a period of at least five years prior to this suit. Here, the evidence convinced the trial court that the water as a whole was put to a beneficial use. While in a sense it might be said that the seepage water was not being beneficially used by Hagerman, we do not look exclusively to that part which seeped, but to the use made of the water as a whole. So long as that water which arrived at its destination was put to a beneficial use, and so long as the amount of water lost through seepage during the transportation of that water from its place of origin to its place of use was reasonable, it cannot be said that the mere fact of seepage transformed it into water not beneficially used.

In short, the trial court's conclusion that Hagerman retained its senior title to the water which through seepage formed Spring A must be affirmed.

II. *The 1971 Agreement.*

The second dispute giving rise to this litigation concerns an agreement in 1971 between Hidden Springs and Hagerman. Hidden Springs began operation in 1971. In order to assure a sufficient supply of water for its fish ponds, it sought the right to use the water in the Hagerman system during the winter season. Hidden Springs filed applications for water right licenses with the State Department of Water Resources in 1969 and 1971, seeking a right to a total of 22.64 cfs. One of these applications listed the period of use as November 1 to April 1. The other two listed the period of use as January 1 to December 31. Hagerman filed objections to these licenses, claiming a superior right to the water under its 1906 decree. In order to work out a suitable arrangement, the stockholders of Hagerman met with representatives of Hidden Springs on April 20, 1971. Hidden Springs presented a draft agreement, which was objected to by some Hagerman members as restricting their right to use water for irrigation prior to April 1, as might be necessary in dry years.

The resulting agreement, in pertinent part, was amended as follows (lined out words represent deletions from proposed draft):

"It is agreed . . . that the water from the Hagerman Water Users springs and spillway may be used by [Hidden Springs] for fish propagation from November 1 until April 1 except at any other time when ~~it is reasonably necessary for~~ the Hagerman Water Users ~~to~~ use this water for irrigation. Furthermore it is expressly understood that the Hagerman Water Users have the year around right of use of any of their water for domestic and livestock purposes and the village of Hagerman has the additional right for the use of 47 miners inches (47 shares) at any time of the year it is necessary for fire protection."

Controversy arose over this agreement because there were several dry years between 1971 and 1976, and water was used by Hagerman during the winter, depriving Hidden Springs of water needed for its fish ponds. As part of its complaint, Hidden Springs charges that Hagerman had no right to use water for irrigation between November 1 and April 1 because it had given away that right in making the 1971 agreement.

 After hearing evidence on the circumstances surrounding the drafting and signing of the agreement, the trial court found that the parties did not intend Hidden Springs' use of the water between November 1 and April 1 to prevent Hagerman's use of the water for irrigation when it desired. A review of the record shows that there is substantial and competent evidence to support such a finding, and thus it will not be disturbed on appeal.

The trial court, while finding that Hagerman could use water for irrigation between

November 1 and April 1, imposed a condition that Hagerman notify Hidden Springs of its intent to use the water at least seven days in advance, to give Hidden Springs an opportunity to minimize the effect of the reduced water flow on its fish. Since no objection was made to this requirement of notice, and since it appears from the record that Hagerman had notified Hidden Springs in the seasons prior to this litigation, we find no need to consider this aspect of the trial court's order.

The judgment is affirmed. Costs, not including attorney's fees, to respondent.

DONALDSON, C. J., and SHEPARD, BAKES and McFADDEN, JJ., concur.