## PUBLIC LANDS COUNCIL ET AL. v. BABBITT, SECRETARY OF THE INTERIOR, ET AL.

No. 98–1991.   Argued March 1, 2000—Decided May 15, 2000

Breyer, J., delivered the opinion for a unanimous Court. O'Connor, J., filed a concurring opinion, in which Thomas, J., joined, *post*, p. 750.

*Timothy S. Bishop* argued the cause for petitioners. With him on the briefs were *Steffen N. Johnson* and *Constance E. Brooks.*

*Deputy Solicitor General Kneedler* argued the cause for respondents. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, David C. Frederick, William B. Lazarus,* and *John D. Leshy.**

*Briefs of *amici curiae* urging reversal were filed for the State of Wyoming by *Gay Woodhouse,* Attorney General, *Thomas J. Davidson,* Deputy Attorney General, and *Theodore C. Preston,* Assistant Attorney General; for the Alameda Bookcliffs Ranch et al. by *Karen Budd-Falen* and *Jeffrey B. Teichert;* for the Association of Rangeland Consultants by *W. Alan Schroeder;* for the Farm Credit Institutions by *William G. Myers III* and *Marcy G. Glenn;* for the Northwest Mining Association by *William Perry Pendley* and *Steven J. Lechner;* for the Pacific Legal Foundation et al. by *M. Reed Hopper;* and for Congressman Don Young et al. by *William K. Kelley.*

Briefs of *amici curiae* urging affirmance were filed for the Natural Resources Defense Council et al. by *Thomas D. Lustig;* and for the Nature Conservancy by *W. Cullen Battle* and *Michael Dennis.*

JUSTICE BREYER delivered the opinion of the Court.

This case requires us to interpret several provisions of the 1934 Taylor Grazing Act, 48 Stat. 1269, 43 U. S. C. §315 *et seq.* The petitioners claim that each of three grazing regulations, 43 CFR §§4100.0–5, 4110.1(a), and 4120.3–2 (1998), exceeds the authority that this statute grants the Secretary of the Interior. We disagree and hold that the three regulations do not violate the Act.

## I

We begin with a brief description of the Act's background, provisions, and related administrative practice.

## A

The Taylor Grazing Act's enactment in 1934 marked a turning point in the history of the western rangelands, the vast, dry grasslands and desert that stretch from western Nebraska, Kansas, and Texas to the Sierra Nevada. Ranchers once freely grazed livestock on the publicly owned range as their herds moved from place to place, searching for grass and water. But the population growth that followed the Civil War eventually doomed that unregulated economic freedom.

A new era began in 1867 with the first successful long drive of cattle north from Texas. Cowboys began regularly driving large herds of grazing cattle each year through thousands of miles of federal lands to railheads like Abilene, Kansas. From there or other towns along the rail line, trains carried live cattle to newly opened eastern markets. The long drives initially brought high profits, which attracted more ranchers and more cattle to the land once home only to Indian tribes and buffalo. Indeed, an early-1880's boom in the cattle market saw the number of cattle grazing the Great Plains grow well beyond 7 million. See R. White, "It's Your Misfortune and None of My Own": A History of the American West 223 (1991); see generally E. Osgood, The Day of the

Cattleman 83–113 (1929); W. Webb, The Great Plains 205–268 (1931).

But more cattle meant more competition for ever-scarcer water and grass. And that competition was intensified by the arrival of sheep in the 1870's. Many believed that sheep were destroying the range, killing fragile grass plants by cropping them too closely. The increased competition for forage, along with droughts, blizzards, and growth in homesteading, all aggravated natural forage scarcity. This led, in turn, to overgrazing, diminished profits, and hostility among forage competitors—to the point where violence and "wars" broke out, between cattle and sheep ranchers, between ranchers and homesteaders, and between those who fenced and those who cut fences to protect an open range. See W. Gard, Frontier Justice 81–149 (1949). These circumstances led to calls for a law to regulate the land that once was free.

The calls began as early as 1878 when the legendary southwestern explorer, Major John Wesley Powell, fearing water monopoly, wrote that ordinary homesteading laws would not work and pressed Congress to enact "a general law . . . to provide for the organization of pasturage districts." Report on the Lands of the Arid Region of the United States, H. Exec. Doc. No. 73, 45th Cong., 2d Sess., 28 (1878). From the end of the 19th century on, Members of Congress regularly introduced legislation of this kind, often with Presidential support. In 1907, President Theodore Roosevelt reiterated Powell's request and urged Congress to pass laws that would "provide for Government control of the public pasture lands of the West." S. Doc. No. 310, 59th Cong., 2d Sess., 5 (1907). But political opposition to federal regulation was strong. President Roosevelt attributed that opposition to "those who do not make their homes on the land, but who own wandering bands of sheep that are driven hither and thither to eat out the land and render it worthless for the real home maker"; along with "the men who have already

obtained control of great areas of the public land . . . who object . . . because it will break the control that these few big men now have over the lands which they do not actually own." *Ibid.* Whatever the opposition's source, bills reflecting Powell's approach did not become law until 1934.

By the 1930's, opposition to federal regulation of the federal range had significantly diminished. Population growth, forage competition, and inadequate range control all began to have consequences both serious and apparent. With a horrifying drought came 'dawns without day' as dust storms swept the range. The devastating storms of the Dust Bowl were in the words of one Senator "the most tragic, the most impressive lobbyist, that ha[s] ever come to this Capitol." 79 Cong. Rec. 6013 (1935). Congress acted; and on June 28, 1934, President Franklin Roosevelt signed the Taylor Grazing Act into law.

## B

The Taylor Act seeks to "promote the highest use of the public lands." 43 U. S. C. § 315. Its specific goals are to "stop injury" to the lands from "overgrazing and soil deterioration," to "provide for their use, improvement and development," and "to stabilize the livestock industry dependent on the public range." 48 Stat. 1269. The Act grants the Secretary of the Interior authority to divide the public rangelands into grazing districts, to specify the amount of grazing permitted in each district, to issue leases or permits "to graze livestock," and to charge "reasonable fees" for use of the land. 43 U. S. C. §§ 315, 315a, 315b. It specifies that preference in respect to grazing permits "shall be given . . . to those within or near" a grazing district "who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights." § 315b. And, as particularly relevant here, it adds:

> "So far as consistent with the purposes and provisions of this subchapter, grazing privileges recognized and ac-

knowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit . . . shall not create any right, title, interest, or estate in or to the lands." *Ibid.*

## C

The Taylor Act delegated to the Interior Department an enormous administrative task. To administer the Act, the Department needed to determine the bounds of the public range, create grazing districts, determine their grazing capacity, and divide that capacity among applicants. It soon set bounds encompassing more than 140 million acres, and by 1936 the Department had created 37 grazing districts, see Department of Interior Ann. Rep. 15 (1935); W. Calef, Private Grazing and Public Lands 58–59 (1960). The Secretary then created district advisory boards made up of local ranchers and called on them for further help. See 2 App. 809–811 (Rules for Administration of Grazing Districts (Mar. 2, 1936)). Limited department resources and the enormity of the administrative task made the boards "the effective governing and administrative body of each grazing district." Calef, *supra*, at 60; accord, P. Foss, Politics and Grass 199–200 (1960).

By 1937 the Department had set the basic rules for allocation of grazing privileges. Those rules recognized that many ranchers had long maintained herds on their own private lands during part of the year, while allowing their herds to graze farther afield on public land at other times. The rules consequently gave a first preference to owners of stock who also owned "base property," *i. e.*, private land (or water rights) sufficient to support their herds, *and* who had grazed the public range during the five years just prior to the Taylor Act's enactment. See 2 App. 818–819 (Rules for Administration of Grazing Districts (June 14, 1937)). They gave a second preference to other owners of nearby "base" property

lacking prior use. *Ibid.* And they gave a third preference to stock owners without base property, like the nomadic sheep herder. *Ibid.* Since lower preference categories divided capacity left over after satisfaction of all higher preference claims, this system, in effect, awarded grazing privileges to owners of land or water. See Foss, *supra,* at 63 (quoting Grazing Division Director F. R. Carpenter's remarks that grazing privileges are given to ranchers "not as individuals, nor as owners of livestock," but to "build up [the] lands and give them stability and value").

As grazing allocations were determined, the Department would issue a permit measuring grazing privileges in terms of "animal unit months" (AUMs), *i. e.,* the right to obtain the forage needed to sustain one cow (or five sheep) for one month. Permits were valid for up to 10 years and usually renewed, as suggested by the Act. See 43 U. S. C. § 315b; Public Land Law Review Commission, One Third of the Nation's Land 109 (1970). But the conditions placed on permits reflected the leasehold nature of grazing privileges, consistent with the fact that Congress had made the Secretary the landlord of the public range and basically made the grant of grazing privileges discretionary. The grazing regulations in effect from 1938 to the present day made clear that the Department retained the power to modify, fail to renew, or cancel a permit or lease for various reasons.

First, the Secretary could cancel permits if, for example, the permit holder persistently overgrazed the public lands, lost control of the base property, failed to use the permit, or failed to comply with the Range Code. See, *e. g.,* 43 CFR §§ 160.26(a)–(f) (1938); Department of Interior, Federal Range Code §§ 6(c)(6), (7), (10) (1942) (hereinafter 1942 Range Code); 43 CFR §§ 161.6(c)(6)–(7), (10)–(12) (1955); 43 CFR §§ 4115.2–1(d), (e)(7)–(11) (1964); 43 CFR §§ 4115.2–1(d) (e)(7)–(11) (1977); 43 CFR § 4170.1–2 (1994); 43 CFR § 4170.1–2 (1998). Second, the Secretary, consistent first

with 43 U. S. C. § 315f, and later the land use planning mandated by 43 U. S. C. § 1712 (discussed *infra*, at 737–738), was authorized to reclassify and withdraw land from grazing altogether and devote it to a more valuable or suitable use. See, *e. g.*, 43 CFR § 160.22 (1938); 1942 Range Code § 6(c)(4); 43 CFR § 161.6(c)(5) (1955); 43 CFR §§ 4111.4–2(f), 4115.2–1(e)(6) (1964); 43 CFR §§ 4111.4–3(f), 4115.2–1(e)(6) (1977); 43 CFR § 4110.4–2(a) (1994); 43 CFR § 4110.4–2(a) (1998). Third, in the event of range depletion, the Secretary maintained a separate authority, not to take areas of land out of grazing use altogether as above, but to reduce the amount of grazing allowed on that land, by suspending AUMs of grazing privileges "in whole or in part," and "for such time as necessary." 43 CFR § 4115.2–1(e)(5) (1964); see also 43 CFR § 160.30 (1938) (reservation (b)); 1942 Range Code § 6(c)(8); 43 CFR § 161.4(8) (1955); 43 CFR §§ 4111.4–3, 4115.2–1(e)(5) (1977); 43 CFR § 4110.3–2 (1994); 43 CFR § 4110.3–2 (1998).

Indeed, the Department so often reduced individual permit AUM allocations under this last authority that by 1964 the regulations had introduced the notion of "active AUMs," *i. e.*, the AUMs that a permit *initially* granted *minus* the AUMs that the department had "suspended" due to diminished range capacity. Thus, three ranchers who had initially received, say, 3,000, 2,000, and 1,000 AUMs respectively, might find that they could use only two-thirds of that number because a 33% reduction in the district's grazing capacity had led the Department to "suspend" one-third of each allocation. The "active/suspended" system assured each rancher, however, that any capacity-related reduction would take place proportionately among permit holders, see 43 CFR § 4111.4–2(a)(3) (1964), and that the Department would try to restore grazing privileges proportionately should the district's capacity later increase, see § 4111.4–1.

In practice, active grazing on the public range declined dramatically and steadily (from about 18 million to about

10 million AUMs between 1953 and 1998) as the following chart shows:

ACTUAL GRAZING USE IN AUMs
USDI-BLM Lands, 1953 to 1998

Brief for Respondents 9a.

Despite the reductions in grazing, and some improvements following the passage of the Taylor Act, see App. 374–379 (Department of Interior, 50 Years of Public Land Management 1934–1984), the range remained in what many considered an unsatisfactory condition. In 1962, a congressionally mandated survey found only 16.6% of the range in excellent or good condition, 53.1% in fair condition, and 30.3% in poor condition. Department of Interior Ann. Rep. 62 (1962). And in 1978 Congress itself determined that "vast segments of the public rangelands are . . . in an unsatisfactory condition." 92 Stat. 1803 (codified as 43 U. S. C. § 1901(a)(1)).

D

In the 1960's, as the range failed to recover, the Secretary of the Interior increased grazing fees by more than 50% (from 19 cents to 30 cents per AUM/year), thereby helping to capture a little more of the economic costs that grazing imposed upon the land. Department of Interior Ann. Rep. 66 (1963). And in 1976, Congress enacted a new law, the

Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, 43 U. S. C. § 1701 *et seq.*, which instructed the Interior Department to develop districtwide land use plans based upon concepts of "multiple use" (use for various purposes, such as recreation, range, timber, minerals, watershed, wildlife and fish, and natural and scenic, scientific, and historical usage), § 1702(c), and "sustained yield" (regular renewable resource output maintained in perpetuity), § 1702(h). The FLPMA strengthened the Department's existing authority to remove or add land from grazing use, allowing such modification pursuant to a land use plan, §§ 1712, 1714, while specifying that existing grazing permit holders would retain a "first priority" for renewal so long as the land use plan continued to make land "available for domestic livestock grazing," § 1752(c).

In 1978, the Department's grazing regulations were, in turn, substantially amended to comply with the new law. See 43 Fed. Reg. 29067. As relevant here, the 1978 regulations tied permit renewal and validity to the land use planning process, giving the Secretary the power to cancel, suspend, or modify grazing permits due to increases or decreases in grazing forage or acreage made available pursuant to land planning. See 43 CFR §§ 4110.3–2(b), 4110.4–2 (1978); see also 43 CFR § 4110.4–2 (1994); 43 CFR § 4110.4–2 (1998).

That same year Congress again increased grazing fees for the period 1979 to 1986. See Public Rangelands Improvement Act of 1978, 43 U. S. C. § 1905. However neither of the two Acts from the 1970's significantly modified the particular provisions of the Taylor Act at issue in this case.

E

This case arises out of a 1995 set of Interior Department amendments to the federal grazing regulations. 60 Fed. Reg. 9894 (1995) (Final Rule). The amendments represent a stated effort to "accelerate restoration" of the rangeland,

make the rangeland management program "more compatible with ecosystem management," "streamline certain administrative functions," and "obtain for the public fair and reasonable compensation for the grazing of livestock on public lands." 58 Fed. Reg. 43208 (1993) (Proposed Rule). The amendments in final form emphasize individual "stewardship" of the public land by increasing the accountability of grazing permit holders; broaden membership on the district advisory boards; change certain title rules; and change administrative rules and practice of the Bureau of Land Management to bring them into closer conformity with related Forest Service management practices. See 60 Fed. Reg. 9900–9906 (1995).

Petitioners Public Lands Council and other nonprofit ranching-related organizations with members who hold grazing permits brought this lawsuit against the Secretary and other defendants in Federal District Court, challenging 10 of the new regulations. The court found 4 of 10 unlawful. 929 F. Supp. 1436, 1450–1451 (Wyo. 1996). The Court of Appeals reversed the District Court in part, upholding three of the four. 167 F. 3d 1287, 1289 (CA10 1999). Those three (which we shall describe further below) (1) change the definition of "grazing preference"; (2) permit those who are not "engaged in the livestock business" to qualify for grazing permits; and (3) grant the United States title to all future "permanent" range improvements. One judge on the Court of Appeals dissented in respect to the Secretary's authority to promulgate the first and the third regulations. See id., at 1309–1318. We granted certiorari to consider the ranchers' claim that these three regulatory changes exceed the authority that the Taylor Act grants the Secretary. 528 U. S. 926 (1999).

## II

### A

The ranchers attack the new "grazing preference" regulations first and foremost. Their attack relies upon the

provision in the Taylor Act stating that "grazing privileges recognized and acknowledged shall be adequately safeguarded . . . ." 43 U. S. C. § 315b. Before 1995 the regulations defined the term "grazing preference" in terms of the *AUM-denominated amount* of grazing privileges that a permit granted. The regulations then defined "grazing preference" as

> "the total number of animal unit months of livestock grazing on public lands apportioned and attached to base property owned or controlled by a permittee or lessee." 43 CFR § 4100.0–5 (1994).

The 1995 regulations changed this definition, however, so that it now no longer refers to grazing privileges "apportioned," nor does it speak in terms of AUMs. The new definition defines "grazing preference" as

> "a superior or priority position against others for the purpose of receiving a grazing permit or lease. This priority is attached to base property owned or controlled by the permittee or lessee." 43 CFR § 4100.0–5 (1995).

The new definition "omits reference to a specified quantity of forage." 60 Fed. Reg. 9921 (1995). It refers only to a priority, not to a specific number of AUMs attached to a base property. But at the same time the new regulations add a new term, "permitted use," which the Secretary defines as

> "the forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and is expressed in AUMs." 43 CFR § 4100.0–5 (1995).

This new "permitted use," like the old "grazing preference," is defined in terms of allocated rights, and it refers to AUMs. But this new term as defined refers, not to a rancher's forage priority, but to forage "allocated by, or under the guidance

of *an applicable land use plan.*" *Ibid.* (emphasis added).
And therein lies the ranchers' concern.

The ranchers refer us to the administrative history of Tay-
lor Act regulations, much of which we set forth in Part I.
In the ranchers' view, history has created expectations in
respect to the security of "grazing privileges"; they have re-
lied upon those expectations; and the statute requires the
Secretary to "safeguar[d]" that reliance. Supported by var-
ious farm credit associations, they argue that defining their
privileges in relation to land use plans will undermine that
security. They say that the content of land use plans is dif-
ficult to predict and easily changed. Fearing that the result-
ing uncertainty will discourage lenders from taking mort-
gages on ranches as security for their loans, they conclude,
that the new regulations threaten the stability, and possibly
the economic viability, of their ranches, and thus fail to "safe-
guard" the "grazing privileges" that Department regulations
previously "recognized and acknowledged." Brief for Peti-
tioners 22–23.

We are not persuaded by the ranchers' argument for three
basic reasons. First, the statute qualifies the duty to "safe-
guard" by referring directly to the Act's various goals and
the Secretary's efforts to implement them. The full subsec-
tion says:

> "*So far as consistent with the purposes and provisions
> of this subchapter,* grazing privileges recognized and ac-
> knowledged shall be adequately safeguarded, *but* the
> creation of a grazing district or the issuance of a permit
> pursuant to the provisions of this subchapter shall *not*
> create any right, title, interest or estate in or to the
> lands." 43 U. S. C. § 315b (emphasis added).

The words "so far as consistent with the purposes . . . of
this subchapter" and the warning that "issuance of a permit"
creates no "right, title, interest or estate" make clear that
the ranchers' interest in permit stability cannot be absolute;

and that the Secretary is free reasonably to determine just how, and the extent to which, "grazing privileges" shall be safeguarded, in light of the Act's basic purposes. Of course, those purposes include "stabiliz[ing] the livestock industry," but they also include "stop[ping] injury to the public grazing lands by preventing overgrazing and soil deterioration," and "provid[ing] for th[e] orderly use, improvement, and development" of the public range. 48 Stat. 1269; see *supra*, at 733.

Moreover, Congress itself has directed development of land use plans, and their use in the allocation process, in order to preserve, improve, and develop the public rangelands. See 43 U. S. C. §§ 1701(a)(2), 1712. That being so, it is difficult to see how a definitional change that simply refers to the use of such plans could violate the Taylor Act by itself, without more. Given the broad discretionary powers that the Taylor Act grants the Secretary, we must read that Act as here granting the Secretary at least ordinary administrative leeway to assess "safeguard[ing]" in terms of the Act's other purposes and provisions. Cf. §§ 315, 315a (authorizing Secretary to establish grazing districts "*in his discretion*" (emphasis added), and to "make provision for protection, administration, regulation, and improvement of such grazing districts").

Second, the pre-1995 AUM system that the ranchers seek to "safeguard" did not offer them anything like absolute security—not even in respect to the proportionate shares of grazing land privileges that the "active/suspended" system suggested. As discussed above, the Secretary has long had the power to reduce an individual permit's AUMs or cancel the permit if the permit holder did not use the grazing privileges, did not use the base property, or violated the Range Code. See *supra*, at 735 (collecting CFR citations 1938–1998). And the Secretary has always had the statutory authority under the Taylor Act and later FLPMA to reclassify and withdraw rangeland from grazing use, see 43 U. S. C.

§ 315f (authorizing Secretary, "in his discretion, to examine and classify any lands . . . which are more valuable or suitable for the production of agricultural crops . . . or any other use than [grazing]"); §§ 1712, 1752(c) (authorizing renewal of permits "so long as the lands . . . remain available for domestic livestock grazing *in accordance with land use plans*" (emphasis added)). The Secretary has consistently reserved the authority to cancel or modify grazing permits accordingly. See *supra,* at 735–736 (collecting CFR citations). Given these well-established pre-1995 Secretarial powers to cancel, modify, or decline to renew individual permits, *including the power to do so pursuant to the adoption of a land use plan,* the ranchers' diminishment-of-security point is at best a matter of degree.

Third, the new definitional regulations by themselves do not automatically bring about a self-executing change that would significantly diminish the security of granted grazing privileges. The Department has said that the new definitions do "not cancel preference," and that any change is "merely a clarification of terminology." 60 Fed. Reg. 9922 (1995). It now assures us through the Solicitor General that the definitional changes "preserve all elements of preference" and "merely clarify the regulations within the statutory framework." See Brief in Opposition 13, 14.

The Secretary did consider making a more sweeping change by eliminating the concept of "suspended use"; a change that might have more reasonably prompted the ranchers' concerns. But after receiving comments, he changed his mind. See 59 Fed. Reg. 14323 (1994). The Department has instead said that "suspended" AUMs will

> "continue to be recognized and have a priority for additional grazing use within the allotment. Suspended use provides an important accounting of past grazing use for the ranching community and is an insignificant administrative workload to the agency." Bureau of Land Man-

agement, Rangeland Reform '94: Final Environmental Impact Statement 144 (1994).

Of course, the new definitions seem to tie grazing privileges to land use plans more explicitly than did the old. But, as we have pointed out, the Secretary has since 1976 had the authority to use land use plans to determine the amount of permissible grazing, 43 U. S. C. § 1712. The Secretary also points out that since development of land use plans began nearly 20 years ago, "all BLM lands in the lower 48 States are covered by land use plans," and "all grazing permits in those States have now been issued or renewed in accordance with such plans, or must now conform to them." Brief for Respondents 26. Yet the ranchers have not provided us with a single example in which interaction of plan and permit has jeopardized or might yet jeopardize permit security. An *amicus* brief filed by a group of Farm Credit Institutions says that the definitional change will "threate[n]" their "lending policies." Brief for Farm Credit Institutions as *Amicus Curiae* 3. But they do not explain *why* that is so, nor do they state that the new definitions will, in fact, lead them to stop lending to ranchers.

We recognize that a particular land use plan could change pre-existing grazing allocation in a particular district. And that change might arguably lead to a denial of grazing privileges that the pre-1995 regulations would have provided. But the affected permit holder remains free to challenge such an individual effect on grazing privileges, and the courts remain free to determine its lawfulness in context. We here consider only whether the changes in the definitions by themselves violate the Taylor Act's requirement that recognized grazing privileges be "adequately safeguarded." Given the leeway that the statute confers upon the Secretary, the less-than-absolute pre-1995 security that permit holders enjoyed, and the relatively small differences that the new definitions create, we conclude that the new definitions do not violate that law.

## B

The ranchers' second challenge focuses upon a provision of the Taylor Act that limits issuance of permits to "settlers, residents, and other *stock owners* . . . ." 43 U. S. C. § 315b (emphasis added). In 1936, the Secretary, following this requirement, issued a regulation that limited eligibility to those who "ow[n] livestock." 2 App. 808 (Rules for Administration of Grazing Districts (Mar. 2, 1936)). But in 1942, the Secretary changed the regulation's wording to limit eligibility to those "engaged in the livestock business," 1942 Range Code § 3(a), and so it remained until 1994. The new regulation eliminates the words "engaged in the livestock business," thereby seeming to make eligible otherwise qualified applicants even if they do not engage in the livestock business. See 43 CFR § 4110.1(a) (1995).

The new change is not as radical as the text of the new regulation suggests. The new rule deletes the entire phrase "engaged in the livestock business" from § 4110.1, and seems to require only that an applicant "own or control land or water base property . . . ." *Ibid.* But the omission, standing alone, does not render the regulation facially invalid, for the regulation cannot change the statute, and a regulation promulgated to guide the Secretary's discretion in exercising his authority under the Act need not also restate all related statutory language. Ultimately it is *both* the Taylor Act and the regulations promulgated thereunder that constrain the Secretary's discretion in issuing permits. The statute continues to limit the Secretary's authorization to issue permits to "bona fide settlers, residents, and *other stock owners.*" 43 U. S. C. § 315b (emphasis added).

Nor will the change necessarily lead to widespread issuance of grazing permits to "stock owners" who are not in the livestock business. Those in the business continue to enjoy a preference in the issuance of grazing permits. The same section of the Taylor Act mandates that the Secretary accord a preference to "landowners engaged in the livestock busi-

ness, bona fide occupants or settlers." *Ibid.* And this statutory language has been extremely important in practice. See *supra*, at 734–735.

The ranchers nonetheless contend that the deletion of the term "engaged in the livestock business" violates the statutory limitation to "stock owners" in § 315b. The words "stock owner," they say, meant "commercial stock owner" in 1934, and a commercial stock owner is not simply one who owns livestock, but one who engages in the business. Hence, they argue, the Secretary lacks the authority to allow those who are not engaged in the business to apply for permits.

The words "stock owner" and "stock owner engaged in the livestock business," however, are not obvious synonyms. And we have found no convincing indication that Congress intended that we treat them as such. Just two sentences after using the words "stock owner," Congress said that, among those eligible for permits (*i. e.*, stock owners), preference should be given to "landowners *engaged in the livestock business*, bona fide occupants or settlers, or owners of water or water rights." § 315b (emphasis added). Why would Congress add the words "engaged in the livestock business" if (as the ranchers' argument implies) they add nothing? Cf. *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 36 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect"). The legislative history to which the ranchers point shows that Congress expected that ordinarily permit holders would be ranchers, who do engage in the livestock business, but does not show any such absolute requirement. See, *e. g.*, H. R. Rep. No. 903, 73d Cong., 2d Sess., 2 (1934); Hearings on H. R. 2835 and H. R. 6462 before the House Committee on the Public Lands, 73d Cong., 1st and 2d Sess., 96 (1933–1934); Hearings on H. R. 6462 before the Senate Committee on Public Lands and Surveys, 73d Cong., 2d Sess., 40 (1934). Nor does the statute's basic purpose require that the two sets of different

words mean the same thing. Congress could reasonably have written the statute to mandate a preference in the granting of permits to those actively involved in the livestock business, while not absolutely excluding the possibility of granting permits to others. The Secretary has not exceeded his powers under the statute.

The ranchers' underlying concern is that the qualifications amendment is part of a scheme to end livestock grazing on the public lands. They say that "individuals or organizations owning small quantities of stock [will] acquire grazing permits, even though they intend not to graze at all or to graze only a nominal number of livestock—all the while excluding others from using the public range for grazing." Brief for Petitioners 47–48. The new regulations, they charge, will allow individuals to "acquire a few livestock, . . . obtain a permit for what amounts to a conservation purpose and then effectively mothball the permit." *Id.*, at 48.

But the regulations do not allow this. The regulations specify that regular grazing permits will be issued for livestock grazing or suspended use. See 43 CFR §§ 4130.2(a), 4130.2(g) (1998). New regulations allowing issuance of permits for conservation use were held unlawful by the Court of Appeals, see 167 F. 3d, at 1307–1308, and the Secretary did not seek review of that decision.

Neither livestock grazing use nor suspended use encompasses the situation that the ranchers describe. With regard to the former, the regulations state that permitted livestock grazing *"shall be based* upon the amount of forage available for livestock grazing as established in the land use plan . . . ." 43 CFR § 4110.2–2(a) (1998) (emphasis added). Permitted livestock use is not simply a symbolic upper limit. Under the regulations, a permit holder is expected to make substantial use of the permitted use set forth in the grazing permit. For example, the regulations prohibit a permit holder from "[f]ailing to make substantial grazing use as authorized for 2 consecutive fee years." § 4140.1(a)(2). If a

permit holder does fail to make substantial use as authorized in his permit for two consecutive years, the Secretary is authorized to cancel from the grazing permit that portion of permitted use that the permit holder has failed to use. See § 4170.1–2. On the basis of these regulations, the Secretary has represented to the Court that "[a] longstanding rule requires that a grazing permit be used for grazing." Brief for Respondents 43, n. 25. Suspended use, in turn, is generally imposed by the Secretary in response to changing range conditions. See *supra*, at 736. Permittees may also apply to place forage in "[t]emporary nonuse" for financial reasons, but the Secretary must approve such nonuse on an annual basis and may not grant it for more than three consecutive years. 43 CFR § 4130.2(g)(2) (1998). A successful temporary nonuse application, moreover, does not necessarily take the land out of grazing use—the Secretary may allocate to others the forage temporarily made available via nonrenewable permit. See §§ 4130.2(h), 4130.6–2. In short, nothing in the change to § 4110.1(a) undermines the Taylor Act's requirement that the Secretary grant permits "to graze livestock." 43 U. S. C. § 315b.

## C

The ranchers' final challenge focuses upon a change in the way the new rules allocate ownership of range improvements, such as fencing, well drilling, or spraying for weeds on the public lands. The Taylor Act provides that permit holders may undertake range improvements pursuant to (1) a cooperative agreement with the United States, or (2) a range improvement permit. 43 U. S. C. § 315c; see 43 CFR §§ 4120.3–2, 4120.3–3 (1998). The pre-1995 regulations applicable to cooperative agreements gave the United States full title to "nonstructural" improvements, such as spraying for weeds, and to "non-removable improvements," such as wells. 43 CFR § 4120.3–2 (1994). But for "structural or removable improvements," such as fencing, stock tanks, or

pipelines, the regulations shared title between the permit holder and the United States "in proportion to the actual amount of the respective contribution to the initial construction." *Ibid.* And for range improvements made pursuant to permit, the pre-1995 regulations gave the permittee "title to removable range improvements." § 4120.3–3(b).

The 1995 regulations change the title rules for range improvements made pursuant to a cooperative agreement, but not the rules for improvements made pursuant to permit. For cooperative agreements, they specify that "title to permanent range improvements" (authorized in the future) "such as fences, wells, and pipelines . . . shall be in the name of the United States." 43 CFR § 4120.3–2(b) (1995).

The ranchers argue that this change violates 43 U. S. C. § 315c, which says:

> "No permit shall be issued which shall entitle the permittee to the use of such [range] improvements constructed *and owned* by a prior occupant until the applicant has paid to such prior occupant the reasonable value of such improvements . . . ." (Emphasis added.)

In their view, the word "owned" foresees ownership by a "prior occupant" of at least some such improvements, a possibility they say is denied by the new rule mandating blanket Government ownership of permanent range improvements.

The Secretary responds that, since the statute gives him the power to *authorize* range improvements pursuant to a cooperative agreement—a greater power, § 315c—he also has the power to set the terms of title ownership to such improvements—a lesser power—just like any landlord. See R. Schoshinski, American Law of Landlord and Tenant § 5:31 (1980) (ownership of tenant improvements is a matter open to negotiation with landlord); H. Bronson, A Treatise on the Law of Fixtures § 40 (1904); 2 J. Taylor, A Treatise on the American Law of Landlord and Tenant § 554, pp. 164–166 (1887). Under this reading, the subsequent statutory provi-

sion relating to "ownership" simply provides for compensation by some future permit holder *in the event* that the Secretary decides to grant title.

As detailed above, the Secretary did grant ownership rights to range improvements under certain circumstances prior to 1995. We see nothing in the statute that prevents him from changing his mind in respect to the future. And the Secretary has now changed his mind for reasons of administrative convenience and because what he takes as the original purpose of this provision (assuring that, in 1934, ranchers would pay compensation to nomadic sheep herders) is no longer important. In any event, the provision retains even the "contemplation of ownership" meaning stressed by the ranchers, for permit holders may still "own" removable range improvements, such as "corrals, creep feeders, and loading chutes, and temporary structural improvements such as troughs for hauled water," 43 CFR § 4120.3–3(b) (1995), which could be transferred to a new permit holder and thus compel compensation under § 315f.

In short, we find nothing in the statute that denies the Secretary authority reasonably to decide when or whether to grant title to those who make improvements. And any such person remains free to negotiate the terms upon which he will make those improvements irrespective of where title formally lies, including how he might be compensated in the future for the work he had done, either by the Government directly or by those to whom the Government later grants a permit. Cf. 43 U. S. C. § 1752(g) (requiring the United States to pay compensation to a permittee for his "interest" in range improvements if it cancels a permit).

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE THOMAS joins, concurring.

I join the Court's opinion. I write separately to make the following observations concerning the Court's decision.

First, in Part II–A, the Court holds that the Secretary did not exceed his authority under the Taylor Grazing Act by promulgating the new "grazing preference" and "permitted use" rules. I agree with that holding but would place special emphasis on the Court's third reason for rejecting petitioners' facial challenge to the regulations. Petitioners have not shown how the new regulations themselves—rather than specific actions the Secretary might take pursuant to those regulations—violate the Taylor Grazing Act's requirement that "grazing privileges recognized and acknowledged . . . be adequately safeguarded." 43 U. S. C. § 315b. It is of particular importance, as the Court notes, *ante*, at 743, that the Secretary has assured us that the new regulations do not in actual practice "alter the active use/suspended use formula in grazing permits" and that " 'present suspended use would continue to be recognized and have a priority for additional grazing use within the allotment.' " Brief for Respondents 22 (quoting Bureau of Land Management, Rangeland Reform '94: Final Environmental Impact Statement 144 (1994)). For these reasons, petitioners' facial challenge to the regulations must fail. Should a permit holder find, however, that the Secretary's specific application of the new regulations deviates from the above assurances and in the process deprives the permit holder of grazing privileges to such an extent that the Secretary's conduct can be termed a failure to adequately safeguard such privileges, the permit holder may bring an as-applied challenge to the Secretary's action at that time. The Court's holding today in no way forecloses such a challenge. See *ante*, at 744 ("[T]he affected permit holder remains free to challenge such an individual [denial of] grazing privileges, and the courts remain free to determine its lawfulness in context").

Second, it is important to note that the Court's decision today only rejects petitioners' claim that the 1995 regulations exceed the Secretary's authority under the Taylor Grazing Act. We are not presented in this case with a claim under the Administrative Procedure Act (APA), 5 U. S. C.

§ 706(2)(A), that the Secretary acted arbitrarily and capriciously in promulgating the new regulations. Under our decision in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 42 (1983), an agency that departs from its previous rules will be found to have acted arbitrarily and capriciously if it fails "to supply a reasoned analysis for the change . . . ." Although petitioners pressed precisely such an "arbitrary and capricious" challenge before the District Court, for whatever reason, they chose not to raise it before this Court. Regardless of whether the "arbitrary and capricious" claim remains open to these permit holders, the Court's decision does not foreclose such an APA challenge generally by permit holders affected by the 1995 regulations.

With these understandings, I join the Court's opinion.