# United States Court of Appeals for the Federal Circuit

05-5047


JOHN B. GOODRICH,
(doing business as Checkerboard Cattle Co.),

Plaintiff-Appellant,

v.


UNITED STATES,

Defendant-Appellee.


Hertha L. Lund, Budd-Falen Law Offices, LLC, of Cheyenne, Wyoming, argued for plaintiff-appellant.  On the brief was Karen Budd-Falen.

Elizabeth Ann Peterson, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.

Appealed from:  United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

05-5047

JOHN B. GOODRICH,
(doing business as Checkerboard Cattle Co.),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  January 9, 2006

_____

Before MICHEL, <u>Chief Judge</u>, LOURIE and LINN, <u>Circuit Judges</u>.

MICHEL, <u>Chief Judge</u>.

Rancher John B. Goodrich appeals the judgment of the United States Court of Federal Claims dismissing as time barred his claim alleging a Fifth Amendment taking of his water rights on federally-owned grazing land in Montana.  <u>Goodrich v. United States</u>, 63 Fed. Cl. 477 (2005).  The trial court held that Goodrich failed to file his claim within the six year statute of limitations prescribed by 28 U.S.C. § 2501.  <u>Id.</u> at 481. Because the trial court correctly determined that the issuance of the Forest Service Record of Decision ("ROD") and final Environmental Impact Statement ("EIS") marked the accrual of Goodrich's claim, we affirm.

# I

Goodrich owns Checkerboard Cattle Co. ("CCC"). Since 1882, CCC cattle have grazed and watered in an area of what is now the Whitetail Allotment of the Lewis and Clark National Forest ("Lewis and Clark Forest"). When the Lewis and Clark Forest was created, the CCC ranch became a "federal lands" ranch, for which the federal government grants permits, assigned in terms of "animal unit months" ("AUMs"),[1] to regulate grazing and foraging on public lands. See Pub. Lands Council v. Babbitt, 529 U.S. 728, 734-35 (2000). First preference for permits is given to ranchers who, like Goodrich, own adjacent "base property" sufficient to support their herds, and who had regularly grazed on the public land in question. Id. Although the land in the Lewis and Clark Forest is owned by the federal government, Goodrich alleges that he owns the right to exclusive use of the water flowing through the Whitetail Allotment under Montana state law and has filed thirty-nine Notices of Water Rights with the state to record those rights.

The Forest Service generally develops an allotment management plan ("AMP") to govern livestock operations on Forest Service lands. 43 U.S.C. §§ 1702(k), 1752(d). Any changes to an AMP must abide by the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., which requires federal agencies to prepare an EIS for "every . . . major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

In 1991, the Forest Service undertook a range analysis to determine whether any changes were needed to its AMP for the Lewis and Clark Forest. The Forest Service

---

[1] One AUM is the right to obtain the forage needed to sustain one cow, or five sheep, for one month. See Pub. Lands Council v. Babbitt, 529 U.S. 728, 735 (2000).

05-5047                                             2

published a draft EIS in August 1995 outlining the environmental impact of each of the various proposals it was considering. Each of the alternatives involved moving cattle belonging to Joseph Kennedy from the Checkerboard Allotment of the Castle Mountains to the Whitetail Allotment of the Little Belt Mountains. Goodrich submitted comments opposing the proposal and pointed out that the current AMP for the Whitetail Allotment specified that the "current permittee", i.e. Goodrich, would receive any additional grazing use on the Allotment. Goodrich argued that, because CCC cattle also grazed in the Checkerboard Allotment, the Forest Service could both meet its environmental goals and maintain compliance with the current AMP by moving additional CCC cattle to the Whitetail Allotment. After considering Goodrich's and other public comments, the Forest Service on February 27, 1997, issued a final EIS and a ROD adopting Alternative 10.[2] The ROD section discussing Alternative 10 stated that "one permittee with 108 AUMs will be moved to the Whitetail Allotment." It does not mention Kennedy by name. The final EIS, however, confirmed that the "permittee" to be moved was Kennedy.[3]

---

[2] Goodrich appealed the ROD pursuant to 36 C.F.R. § 215, and its legality was upheld by a Deputy Regional Forester on May 23, 1997. Goodrich continues to challenge the ROD in federal district court independent of these proceedings. Goodrich v. United States Forest Serv., No. 6:03cv22 (D. Mont. filed May 15, 2003). In a separate lawsuit, Goodrich is also seeking injunctive and declaratory relief based on allegations that the Forest Service actions violated the Fifth and Eighth Amendments. Goodrich v. United States Forest Serv., No. 6:03cv23 (D. Mont. filed May 20, 2003).

[3] In his complaint, Goodrich alleged that the ROD "implemented 'alternative 10' of the FEIS, which provided among other things that 108 AUMs belonging to Mr. Kennedy would be moved" to the Whitetail Allotment. Goodrich subsequently filed errata replacing Kennedy's name with the phrase "one permittee". In his brief to this court, Goodrich explicitly stated that "[t]he FEIS did not state who would get those 108 AUMs that were being moved from the allotment in the Castle Mountains to the Whitetail Allotment in the Little Belt Mountains." It thus appeared to the panel that the trial court committed clear factual error in finding that the final EIS named Kennedy as the party to be moved to the Whitetail Allotment. See Goodrich, 63 Fed. Cl. at 479. However, at oral argument, counsel for the government stated that the final EIS indeed referred to Kennedy by name. This court requested a copy of the final EIS to resolve

05-5047                                           3

Alternative 10 insofar as it concerned Kennedy's cattle was not implemented for several years. In May 1998, the Forest Service sent Goodrich a letter stating that Kennedy's cattle would not be run in the Whitetail Allotment "until 1999, at the earliest." Then, on April 25, 2000, Goodrich received official notice from the Forest Service that the portion of the 1997 ROD assigning grazing permits on the Whitetail Allotment to Kennedy would be implemented that grazing season, and on July 1, 2000, Kennedy's cattle physically entered the Whitetail Allotment. Goodrich lost 79 AUMs in the Whitetail Allotment corresponding to the 79 AUMs issued to Kennedy (down from the original 108 AUMs transferred by the ROD).

On June 9, 2004, Goodrich filed suit in the United States Court of Federal Claims alleging that, by allowing another permittee to graze on the Whitetail Allotment, the United States effected a taking of his exclusive water rights in violation of the takings clause of the Fifth Amendment. The United States moved to dismiss Goodrich's complaint as barred by the six-year statute of limitations provided by 28 U.S.C. § 2501, and the United States Court of Federal Claims granted the motion. The trial court categorized the alleged taking as regulatory and held that the February 28, 1997, issuance of the ROD and final EIS signaled the accrual of Goodrich's takings claim. Goodrich, 63 Fed. Cl. at 480. Goodrich appealed to this court, which has jurisdiction under 28 U.S.C. § 1295(a)(3).

---

the dispute. See Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings."). A review of the final EIS reveals that not only does Alternative 10 state "Kennedy (108 AUMs) moved to Little Belt Mountains", but all eleven alternatives being considered by the Forest Service repeat this exact language. Goodrich thus misstated the content of the final EIS before both the trial court and this appellate court. As such, counsel for Goodrich was, at best, extremely careless in crafting its pleadings and appellate brief.

**II**

A claim brought in the United States Court of Federal Claims must be filed within six years of its accrual date. 28 U.S.C. § 2501; Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). A claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action". Hopland, 855 F.2d at 1577. "Therefore, a claim under the Fifth Amendment accrues when that taking action occurs." Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994). However, the claim only accrues if the claimant "knew or should have known" that the claim existed. Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988). Here, there is no question that Goodrich was aware of the claim. Thus, because Goodrich's complaint was filed on June 9, 2004, it is timely only if the claim accrued on or after June 9, 1998.

Goodrich alleges a physical taking that accrued on July 1, 2000, when Kennedy's cattle first entered the Whitetail Allotment for the grazing season. In the alternative, Goodrich asserts that the taking did not "stabilize" until April 25, 2000, when he received official notice from the Forest Service that the portion of Alternative 10 transferring the Kennedy livestock to the Whitetail Allotment would be implemented on July 1. Either date would bring him within the statute. In support of the latter assertion, Goodrich points to a January 2000 grazing proposal in which the Forest Service stated that Kennedy's cattle would be moved "from the Castle[ Mountains] to the Upper Spring Creek allotment." In light of this subsequent document, Goodrich argues, it is clear that the 1997 ROD did not constitute a final decision. Goodrich further argues that an attempt to file a takings claim prior to the implementation of Alternative 10 would have

been rejected as unripe because he had not yet suffered any harm. We address each of these arguments in turn.

## A

Goodrich argues that the taking alleged is physical, i.e. a government appropriation of his water for the use of government agents, the Kennedy cattle. Although there is no controlling precedent in this case, we find this court's earlier holding in Fallini v. United States, 56 F.3d 1378 (Fed. Cir. 1995), to be the closest analogue. The plaintiffs in Fallini, as in the present case, were cattle ranchers who argued that the government effected a taking by authorizing other animals to use water to which they enjoyed proprietary rights. Id. at 1379. The government action at issue in Fallini was the 1971 enactment of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-40, intended by Congress to protect wild horses and burros on public lands. Id. at 1379-80. As this court stated in Fallini, the "proper focus for statute of limitations purposes is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts became most painful." Id. at 1383 (quoting Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980) (emphasis added)). In other words, "[w]hat the Fallinis may challenge is what the government has done, not what the horses have done." Id. The Fallini court determined that the statute of limitations was triggered upon the enactment of the Wild Free-Roaming Horses and Burros Act. Id. Similarly, then, the statute of limitations period here commenced upon the Forest Service's adoption of Alternative 10 in the ROD.

Goodrich urges this court to distinguish Fallini because, unlike wild horses, Kennedy's cattle were permittees of the government, i.e. government "agents or instrumentalities", and thus fall expressly into a possible exception to the rule articulated

in Fallini. See 56 F.3d at 1383 ("If the horses were agents or instrumentalities of the United States government, the analysis of what governmental action constituted the alleged taking might well be different."). This argument is not without some merit. However, it would stretch the definition of "agent" too far to include a mere permittee. Whereas an agent is acting on behalf of, and usually at the direction of, his principal, a permittee is granted the option, but not the obligation, to engage in certain activities. If Kennedy declined to graze his cattle on the Whitetail Allotment, the Forest Service could not force him to, as it could force actions of, for example, a government employee or contractor. As such, Kennedy's cattle cannot reasonably be considered "agents or instrumentalities" of the government. Nor can Kennedy himself.

**B**

We reject Goodrich's assertion that the January 2000 grazing proposal, under which Kennedy's cattle "will be moved from the Castle[ Mountains] to the Upper Spring Creek Allotment", establishes that the February 1997 ROD did not constitute a final decision. First, we note that the January 2000 letter was merely a proposal, and was not subjected to the same lengthy process requirements as the previously-issued ROD.

Second, we find Goodrich's reliance on the "stabilization principle" articulated by the Supreme Court in United States v. Dickinson, 331 U.S. 745 (1947), to be misplaced. Goodrich argues that, under Dickinson, the statute of limitations did not commence until the government actions became "stabilized"; here, in April 2000, when the Forest Service notified Goodrich that the portion of Alternative 10 transferring Kennedy's cattle to the Whitetail Allotment would be implemented that July. Dickinson, however, is clearly distinguishable from the present case. In Dickinson, the government dammed the Kanawha River in West Virginia, raising the water level by successive stages and

flooding the petitioners' land over a period of years. Id. at 746-47. The government never condemned the flooded land. Id. at 747-48. The Supreme Court held that, because the government failed to engage in "appropriate proceedings" which would have "fixed the time when the property was 'taken'", the takings claim was not barred by the statute of limitations. Id. The Court's main concern was the government's failure to provide affected parties with notice of its action, and the Court explicitly limited its holding to situations where, rather than undertake proper administrative procedures, the government "bring[s] about a taking by a continuing process of physical events". Id. at 749. Here, the Forest Service followed exhaustive statutory and regulatory requirements, involving several years of investigation, analysis and involvement of affected parties before reaching its decision to adopt Alternative 10. It published formal documents providing all affected parties with notice of its decision. See 61 Fed. Reg. 12181 (March 14, 1997) (providing notice of availability of final EIS for Lewis and Clark Forest). The unqualified language of the ROD reinforces the finality of the government action: there is no conditional phrase such as "authorizing the implementation of" or "granting the option to implement" Alternative 10. Rather, Gloria E. Flora, the Forest Supervisor of the Lewis and Clark Forest, stated in the ROD that she had made a "decision to implement Alternative 10". The fact that it took the Forest Service several years to implement the Kennedy portion of Alternative 10 does not change the nature of the decision.[4] Indeed, the government here followed the exact opposite approach compared to Dickinson.

---

[4] The ROD, in fact, explains that implementation will occur over several years. It states that reductions will first be implemented annually through "administrative non-use", and then will be further increased, as necessary, through "permit action".

Moreover, Goodrich was extensively involved each step of the pre-decision process. As early as 1993, a CCC representative participated in Forest Service meetings in which the proposal to transfer Kennedy's cattle to the Whitetail Allotment was discussed, and notified the Forest Service then that such a transfer would constitute an "uncompensated taking" of Goodrich's water rights. Goodrich received a copy of the August 1995 draft EIS, and promptly submitted comments objecting to the proposal. Chapter X of the final EIS, which details public involvement in the decisionmaking process, named Goodrich as one of the parties who had expressed concern over the draft EIS. It is only reasonable to assume that, once the Forest Service reached its decision, Goodrich promptly reviewed both the ROD and Alternative 10 in the final EIS; he does not argue to the contrary. Thus, there is no indication that Goodrich was incapable of filing suit immediately upon accrual of his takings claim.

We liken the present case to cases in which this court has restated repeatedly its holding that a takings claim accrues upon the denial of a permit application. See, e.g., Seiber v. United States, 364 F.3d 1356, 1365 (Fed. Cir. 2004); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347 (Fed. Cir. 2002); Bayou Des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1039 (Fed. Cir. 1997). A ROD issuance is even more clearly final than a permit denial, as a party may simply reapply for a permit or engage in negotiations with the permitting agency. In contrast, the ROD and final EIS are final agency statements of official position that are published only after years of analysis and consultation with affected parties. Given this court's precedent with respect to permits, it is only logical to conclude that a ROD issuance would be sufficient to accrue a takings claim.

The trial court supported its ruling that Goodrich's claim accrued in February 1997, upon issuance of the ROD and final EIS, with case law from our sister circuits holding that, for purposes of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, a ROD is a "final agency action." See Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002) (finding the ROD "signaled the end of the decisionmaking process"); Sw. Williams County Cmty. Ass'n, Inc. v. Slater, 173 F.3d 1033, 1036 (6th Cir. 1999) ("[A] final [EIS] or the [ROD] issued thereon constitute[s] final agency action."). We believe that the trial court's analogy to APA cases is fitting, and hold that in a case like this a takings claim accrues upon the Forest Service's issuance of a final EIS and ROD. Goodrich has presented no evidence that a higher body within the Forest Service could overturn the decision to grant AUMs at Whitetail to Kennedy, and thus all evidence supports our holding that the ROD and final EIS also constituted final agency action for purposes of a takings claim.

## C

Goodrich further argues that, had he filed suit upon issuance of the ROD, his claim would have been dismissed as unripe because he had not yet suffered harm. On this point as well, Fallini is a useful but imperfect analogue, as the plaintiffs there suffered injury contemporaneously with the enactment of the Wild Free-Roaming Horses and Burros Act. In contrast, here, it took the Forest Service over three years to implement the portion of Alternative 10 transferring Kennedy's cattle to the Whitetail Allotment.

As between issuance of the ROD and the actual physical appropriation by cattle of water, we believe the former is a better place to deem any taking occurred. First, the question of damages is discrete from the question of claim accrual. As the court in

Fallini stated, the "obligation to sue" arises once the "permanent nature" of the government action is evident, regardless of whether damages are "complete and fully calculable". 56 F.3d at 1382-83. Second, as a practical matter, it will often be much easier for the parties to correct a wrongful taking if litigation is initiated before its effects are felt. If Goodrich was required to wait until Kennedy's cattle appropriated his water, then it might be impractical, if not nearly impossible, to right the wrong. Thus, we conclude that the issuance of a ROD and final EIS is sufficient to constitute the taking and hence accrue a takings claim, regardless of when the consequences of the decisions contained therein are felt.

### III

In sum, the Forest Service made its final decision to grant AUMs at Whitetail to Kennedy in February 28, 1997, when it issued its final EIS and ROD. Goodrich's Fifth Amendment takings claim therefore accrued as of that date. Because Goodrich did not file his complaint until June 9, 2004, more than six years after the claim accrued, his cause of action is barred by the statute of limitations. The judgment of the United States Court of Federal Claims is therefore

### AFFIRMED.