# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 32278, 32279, & 32846

| | |
|---|---|
| IN RE: SRBA CASE NO. 39576, (SUBCASE NOS. 55-10135, 55-11061, 55-11385 AND 55-12452). | ) )  Twin Falls, November 2006 Term ) ) )  2007 Opinion No. 23 ) )  Filed: February 9, 2007 ) ) )  Stephen W. Kenyon, Clerk |
| JOYCE LIVESTOCK COMPANY, | |
| Appellant-Respondent, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent-Appellant. | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, in and for Twin Falls County. The Hon. John M. Melanson, District Judge.

The judgment is <u>affirmed</u> in part, <u>vacated</u> in part, and <u>remanded</u> for further proceedings.

McQuaid Bedford & Van Zandt LLP, San Francisco, California, and Roger D. Ling, Rupert, counsel for Joyce Livestock Company. Elizabeth P. Ewens argued.

United States Department of Justice for the United States of America. Ellen J. Durkee argued.

---

EISMANN, Justice.

This is an appeal from a judgment upholding Joyce Livestock Company's claim to instream water rights on federal rangeland for watering livestock, determining the priority dates of those water rights, and rejecting the claim of the United States that it also has instream water rights based upon appropriations by those it permitted to use the rangeland after enactment of the

Taylor Grazing Act in 1934. The district court also denied Joyce Livestock Company's request for an award of attorney fees. We affirm the district court's holding that Joyce Livestock Company has instream water rights, vacate its determination of priority, and remand for a redetermination of the priority dates of such rights. We uphold its denial of the water rights claimed by the United States and its denial of Joyce Livestock Company's request for attorney fees.

## I. FACTS AND PROCEDURAL HISTORY

Joyce Livestock Company (Joyce Livestock), a limited partnership formed in 1985, is a cattle operation located in Owyhee County, Idaho. It owns approximately 10,000 acres of land that is an accumulation of twenty-nine different homesteads and small ranches. The earliest patents in the chain of title of the properties owned by Joyce Livestock were issued in 1898. It filed a claim for instream[1] stockwater rights in Jordan Creek with a priority date of 1898. The United States filed overlapping claims for instream stockwatering with a priority date of 1934, the year of adoption of the Taylor Grazing Act, 43 U.S.C. § 315 *et seq.*

The matter was first heard by a special master. He recommended that the water rights claimed by Joyce Livestock be denied because there was no evidence that Joyce Livestock's predecessors had attempted to exclude other ranchers from using the water source used by the predecessors. Absent such evidence, the special master concluded that the predecessors lacked the requisite intent to acquire water rights. The special master also recommended that the water right claimed by the United States be granted, with a priority date of June 28, 1934, the date of enactment of the Taylor Grazing Act. According to the special master, the actions of the United States, through the Bureau of Land Management, in making the rangeland available to ranchers combined with its management of the rangeland demonstrated an intent to appropriate water and constituted a diversion of the water and an application of it to a beneficial use.

The district court reviewed the special master's recommendations. It held that the special master erred in holding that Joyce Livestock's predecessors lacked the intent required to obtain a water right. The district court ruled that the necessary intent could be inferred from the act of

---

[1] Although we refer to them as "instream" water rights, the water sources do not need to be streams. They can be any natural water source, including springs that simply form pools of water. Calling them instream water sources simply means that the water was applied to a beneficial use without diverting it from the water source.

watering livestock. The district court determined, however, that Joyce Livestock's predecessors could not have obtained water rights on federal land unless their applications for grazing permits filed under the Taylor Grazing Act showed that they understood or believed they had acquired such water rights. Because such evidence was lacking from the grazing permit applications, the district court held that the earliest priority date Joyce Livestock could establish for its water rights was April 26, 1935. That was the date on which John T. Shea filed an application for a grazing permit.

The district court also denied the United States's water rights claim. There was no evidence that the United States had appropriated any water by grazing livestock. The district court noted that under Idaho law, a water right obtained by the lessee of real property is owned by the lessee unless the lessee was acting as an agent of the lessor in acquiring the water right. In this case, the United States did not show that any of Joyce Livestock's predecessors were acting as its agent when they acquired water rights.

The district court entered a judgment awarding Joyce Livestock a water right with a priority date of April 26, 1935, and denying the claims of the United States. It certified the judgment as final pursuant to Rule 54(b) of the Idaho Rules of Civil Procedure.

Joyce Livestock sought an award of attorney fees against the United States. The district court held that it was not entitled to an award under Idaho Code § 12-121 because the United States did not act frivolously, unreasonably, or without foundation in asserting its water rights claim and opposing the claim of Joyce Livestock. It likewise denied an award pursuant to 28 U.S.C. 2412(d) because it found the position of the United States substantially justified. Both Joyce Livestock and the United States appealed.

## II. ISSUES ON APPEAL

1. Did the district court err in finding that Joyce Livestock had acquired a water right on federal land for watering stock?

2. Did the district court err in determining the priority date of Joyce Livestock's water right?

3. Did the district court err in denying Joyce Livestock's request for an award of attorney fees under Idaho Code § 12-121 and 28 U.S.C. § 2412(d)?

4. Did the district court err in denying the United States's claim for a water right for watering stock?

3

5.  Is Joyce Livestock entitled to an award of attorney fees on appeal?

## III.  ANALYSIS

**A.  Did the District Court Err in Finding that Joyce Livestock Had Acquired a Water Right on Federal Land for Watering Stock?**

      **1.  An appropriator can obtain a water right in nonnavigable waters located on federal land.**  When the arid regions of the West were initially settled, local custom and usage held that the first appropriator of water for a beneficial use had the better right to the use of the water to the extent of his actual use.  *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935).  "The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection."  *Id*. at 154.  That custom likewise prevailed among the early settlers in what became the State of Idaho.  As this Court explained in *Drake v. Earhart*, 2 Idaho 750, 753-54, 23 P. 541, 542 (Idaho Terr. 1890), with respect to the early emigrants to this area:

> They found a new condition of things.  The use of water to which they had been accustomed, and the laws concerning it, had no application here.  The demand for water they found greater than the supply, as is the unfortunate fact still all over this arid region.  Instead of attempting to divide it among all, thus making it unprofitable to any, or instead of applying the common-law riparian doctrine, to which they had been accustomed, they disregarded the traditions of the past, and established as the only rule suitable to their situation that of prior appropriation.  This did not mean that the first appropriator could take all he pleased, but what he actually needed, and could properly use without waste.  Thus was established the local custom, which pervaded the entire west, and became the basis of the laws we have to-day on that subject.  Very soon these customs attracted the attention of the legislatures, where they were approved and adopted, and next we find them undergoing the crucial test of judicial investigation.

"This general policy [of prior appropriation] was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866."  *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 154 (1935).  Section 9 of that Act, codified at 30 U.S.C. § 51, provided:

> Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of

4

ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

"This provision was 'rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one.'" *Id*. at 155 (quoting *Broder v. Natoma Water & Min. Co.*, 101 U.S. 274, 276 (1879)).

In 1877 Congress passed the Desert Land Act to encourage and promote the economic development of the arid and semiarid public lands of the Western United States, including those in what would become the State of Idaho. "The federal government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately." *Ickes v. Fox*, 300 U.S. 82, 95 (1937). As the Supreme Court said two years earlier in *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 161 (1935), with reference to the Desert Land Act, "It is hard to see how a more definite intention to sever the land and water could be evinced." The Court also stated that the Desert Land Act "simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation . . . . The public interest in such state control in the arid land states is definite and substantial." *Id*. at 164.

Thus, the appropriation of the nonnavigable waters within this State, including those located on federal land, is a matter of state law. "[A]ll nonnavigable waters were reserved for the use of the public under the laws of the various arid-land states." *Ickes v. Fox*, 300 U.S. 82, 95 (1937). "While the basics of the doctrine of prior appropriation is the same from state to state, the doctrine has evolved to meet the specific needs of each state and thus differs among the western states. Congress understood this fact and that is why the laws concerning appropriation were left up to each individual state." *Idaho Dept. of Water Resources v. U.S.*, 122 Idaho 116, 124, 832 P.2d 289, 297 (1992).

"One who has appropriated water and beneficially used it has a right to the use of the water independent of his ownership of the land." *Sanderson v. Salmon River Canal Co.*, 34 Idaho 145, 160, 199 P. 999, 1003 (1921). Idaho has long recognized that an appropriator can

5

obtain a water right in waters located on federal land. *Keiler v. McDonald*, 37 Idaho 573, 218 P. 365 (1923); *Short v. Praisewater*, 35 Idaho 691, 208 P. 844 (1922); *Sarret v. Hunter*, 32 Idaho 536, 185 P. 1072 (1919); *Le Quime v. Chambers*, 15 Idaho 405, 98 P. 415 (1908); *Hillman v. Hardwick*, 3 Idaho 255, 28 P. 438 (1891). The appropriator simply must follow Idaho law in obtaining that water right.

The United States argues that prior to the enactment of the Taylor Grazing Act, the ranchers should not have been able to obtain a water right by grazing livestock on public lands because they did not have the right to exclude others from those lands or from water sources located on those lands. The United States is correct that one rancher did not have the right to exclude another from grazing livestock on public lands. *Buford v. Houtz*, 10 U.S. 305 (1890). A water right, however, is not based upon having exclusive access to a water source. It does not constitute ownership of the water. *See, Idaho Conservation League, Inc. v. State*, 128 Idaho 155, 156-57, 911 P.2d 748, 749-50 (1995) ("The state's ownership of the water that is the subject of the adjudication, is not before the SRBA court, nor is that ownership interest in any way diminished by the adjudication of claimants' rights. The proprietary rights to use water, which are the subject of the SRBA, are held subject to the public trust"). The prior appropriation doctrine recognizes that two or more parties can obtain a right to use water from the same source. "[T]wo parties may at the same time be in possession of water from a creek and neither hold adverse to the other; each may justly claim the right to use the water he is using, without affecting the rights of the other." *Graham v. Leek*, 65 Idaho 279, 144 P.2d 475, 480-81 (1943) (quoting from *St. Onge v. Blakely*, 245 P. 532, 536 (Mont. 1926)). Thus, an appropriator need not have exclusive access to federal lands in order to obtain a water right in waters situated on those lands.

**2. Under the constitutional method, an appropriator could obtain a water right for stock watering without diverting the water from the water source.** "Until 1971 Idaho recognized two methods of appropriating water of the state both of which were equally valid: the statutory method of appropriation and the constitutional method of appropriation." *Fremont-Madison Irrigation Dist. and Mitigation Group v. Idaho Ground Water Appropriators, Inc.*, 129 Idaho 454, 456, 926 P.2d 1301, 1303 (1996). In 1971 the legislature amended Idaho Code §§ 42-103 and 42-201 to require compliance with the statutory application, permit, and license

6

procedure in order to acquire new water rights. Ch. 177, §§ 1 & 2, 1971 Idaho Sess. Laws 843-44. "Although new appropriations could not be made under the constitutional method after 1971, the validity of existing constitutional appropriations continues to be recognized." *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000) (citation omitted).

The constitutional method of appropriation generally requires an actual diversion in order to obtain a water right. Under the constitutional method, however, "[n]o diversion from a natural watercourse or diversion device is needed to establish a valid appropriative water right for stock watering." *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000). Thus, Joyce Livestock's predecessors could obtain a water right under the constitutional method by watering their livestock at water sources on the public range without having to divert the water or modify the water source.

Even though we refer to it as the constitutional method of appropriating water, the Idaho Constitution did not create the doctrine of prior appropriation. "The rights of appropriators were regulated in the first instance by local customs, and out of these initial sources grew our present laws and rules with respect to irrigation." *Sarret v. Hunter*, 32 Idaho 536, 542, 185 P. 1072, 1074 (1919). "The framers and adopters of our Constitution were familiar with the prevailing customs and rules governing the manner in which water might be appropriated . . ., and they gave it form and sanction by writing it in the fundamental law of the state." *Id.* at 543, 185 P. at 1075. "The rule in this state, both before and since the adoption of our constitution, is . . . that he who is first in time is first in right." *Brossard v. Morgan*, 7 Idaho 215, 219-20, 61 P. 1031, 1033 (1900). Thus, water rights obtained in a manner that is now called the constitutional method of appropriation are entitled to protection even though the water was appropriated prior to the adoption and ratification of our Constitution in 1889 and its approval by Congress in 1890. *Hillcrest Irrigation Dist. v. Nampa & Meridian Irrigation Dist.*, 57 Idaho 403, 66 P.2d 115 (1937) (upholding priorities of 1864, 1869, and 1887); *Branstetter v. Williams*, 6 Idaho 574, 57 P. 433 (1899) (upholding priority of 1863); *Drake v. Earhart*, 2 Idaho 716, 23 P. 541 (1890) (upholding priority of 1879).

**3. Joyce Livestock's predecessors obtained water rights on federal land for stock watering.** Under the constitutional method of appropriation, "a water user could make a valid appropriation without a permit, most commonly by diverting the water and putting it to

7

beneficial use." *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000). Because no diversion is required in order to obtain a water right for stock watering under the constitutional method, *Id.*, Joyce Livestock's predecessors could obtain water rights for stock watering simply by applying the water to a beneficial use. There is no dispute that watering livestock is a beneficial use of water. *Stevenson v. Steele*, 93 Idaho 4, 453 P.2d 819 (1969). Therefore, they could obtain water rights simply by watering their livestock in the springs, creeks, and rivers on the range they used for forage.

The United States argues that there must also be evidence that Joyce Livestock's predecessors intended to obtain a water right. The district court agreed, but held that the intent could be inferred if the predecessors applied the water to a beneficial use. We have not held that an intent to obtain a water right was a requirement for appropriating water under the constitutional method.

The two essentials for obtaining a water right under the constitutional method were typically diversion and application to a beneficial use. *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000). As we stated in *Morgan v. Udy*, 58 Idaho 670, 680, 79 P.2d 295, 299 (1938), "In other words, in this state one may have a valid appropriation though only a temporary and revocable way of conveyance for his water; diversion and application to a beneficial use being the two essentials." The statement in *Morgan v. Udy* is consistent with the history of obtaining water rights prior to the adoption of our Constitution.

The first act passed by the territorial legislature concerning the appropriation of water was in 1881. *Kirk v. Bartholomew*, 3 Idaho 367, 369-70, 29 P. 40, 41 (1892). That act, compiled at Idaho Revised Statutes §§ 3155 *et seq.* (1887), provided a statutory procedure for obtaining a water right. The person first posted a written notice at the point of diversion and then, within sixty days, commenced construction of the diversion works. If the person diligently prosecuted that construction work to completion, the priority date of the water right would relate back to the date the notice was posted. The act also included a provision recognizing the validity of water rights that had been acquired prior to 1881 by diverting the water and applying it to a beneficial use, stating that such diversion and application to a beneficial use "shall be taken to have secured

8

the right to the waters claimed."[2]  The territorial legislature did not indicate that there was an additional intent element to obtaining valid water rights under the constitutional method.

"The right to appropriate unappropriated water is guaranteed by article XV, section 3 of the Idaho Constitution." *Parker v. Wallentine*, 103 Idaho 506, 513, 650 P.2d 648, 655 (1982). "Prior to adoption of a mandatory permit system in 1971 this constitutional declaration was construed as authorizing a person to appropriate the water of a stream simply by 'actually diverting the water and applying it to a beneficial use.'" *Fremont-Madison Irrigation Dist. and Mitigation Group v. Idaho Ground Water Appropriators, Inc.*, 129 Idaho 454, 456, 926 P.2d 1301, 1303 (1996) (quoting from *Sand Point Water & Light Co. v. Panhandle Dev. Co.*, 11 Idaho 405, 413, 83 P. 347, 349 (1905)).  As we stated in *Cantlin v. Carter*, 88 Idaho 179, 186, 397 P.2d 761, 765 (1964), "By actually diverting and applying water to a beneficial use, a legal appropriation is made."  Likewise, in *Furey v. Taylor*, 22 Idaho 605, 127 P. 676, 678 (1912), we said, "[T]he appellant having made an appropriation of 350 inches from the water flowing in Pass creek by actually diverting the water and applying the same to a beneficial use, such appropriation was legal and clearly authorized by section 3, art. 15, of the Constitution."

The district court held that there must be an "intent to appropriate" in order to have obtained a water right under the constitutional method.  It is not clear what the district court meant by an intent to appropriate.  The court could have meant an intent to obtain a water right that would be recognized and protected under the law, or it could have meant an intent to apply the water to a beneficial use.  We have not required either intent in order to obtain a water right under the constitutional method of appropriation.

The district court read *Hidden Springs Trout Ranch, Inc. v. Hagerman Water Users, Inc.*, 101 Idaho 677, 619 P.2d 1130 (1980), as requiring three elements for a valid appropriation under the constitutional method:  (1) intent to appropriate, (2) physical diversion from a natural

---

[2] In *Kirk v. Bartholomew*, 3 Idaho 367, 369-70, 29 P. 40, 41 (1892), we quoted that portion of the statute as follows:

> Section 8 of said act secures to persons who had made appropriations of water prior to the date of said act all of the water so appropriated, and is as follows:  "Sec. 8. All ditches, canals, and other works heretofore made, constructed, or provided, and by means of which the waters of any stream have been diverted and applied to any beneficial use, shall be taken to have secured the right to the waters claimed, to the extent of the quantity which said works are capable of conducting, and not exceeding the quantity claimed, without regard to or compliance with the requirements of this act."

watercourse, and (3) application of the water to a beneficial use. That case involved a dispute between two appropriators, and the issue being addressed was whether the actions of one of them were sufficient to constitute diverting water from a spring. When addressing that issue, we stated:

> First, Hidden Springs argues that the water constituting Spring A was never successfully diverted by Hagerman, and therefore could not have been included in the 1906 decree. Based on the record, we do not find this argument persuasive. Diversion is a prerequisite to appropriation of water, along with the application of such water to a beneficial use, but diversion as such has not been defined. For example: "The test of a valid appropriation of water is its diversion from the natural source and its application to a beneficial use." *Sarret v. Hunter*, 32 Idaho 536, 541, 185 P. 1072, 1074 (1919). "It is generally held that to constitute a valid appropriation of water there must be a bona fide intent to apply it to some beneficial use, existing at the time or contemplated in the future, followed by diversion from the natural channel by means of a ditch, canal, or other structure and also an active application of the water, within a reasonable time, to a beneficial use." 78 Am.Jur.2d Waters § 321 (1975) (footnotes omitted). I.C. § 42-101 provides that the "waters of the state, when flowing in their natural channels," are subject to appropriation. *See also Rabido v. Furey*, 33 Idaho 56, 190 P. 73 (1920). It is Hidden Springs' contention that the diversion necessary for appropriation must be from the natural source of the water, and that here the spring field is the natural source, including both Spring A and the springs from which the water first emerged. Since the water never left the spring field, Hidden Springs argues the water was never diverted. In considering this contention, we rely upon those cases which refer to diversion from the natural channel of the water, making it sufficient, for establishing diversion, that the water flows in a different channel than it would have done absent intervention by the appropriator.
>
> Here, there can be no dispute that Hagerman did divert the water from its natural channel; instead of running downhill directly into the creek, the water entered a pipe and traveled approximately one-half mile before the water here in dispute was lost as seepage and re-emerged as Spring A. There can be no question but that had Hagerman made use of the water at the point of the seepage loss, it would have been considered diverted for purposes of appropriation.

101 Idaho at 679-80, 619 P.2d at 1132-33. The district court read our quotation from American Jurisprudence Second as adding the requirement that an appropriator must intend to apply the water to some beneficial use. The appropriator's intent was not even an issue in the *Hidden Springs* case. Had we intended to add intent as a required element, we would not have included the quotation from *Sarret v. Hunter* stating, "The test of a valid appropriation of water is its

diversion from the natural source and its application to a beneficial use." There is no mention in that quotation of also having an intent to apply the water to a beneficial use.

Application to a beneficial use was necessary to obtain the water right under the constitutional method of appropriation. You could certainly infer that a person who diverts water and applies it to a beneficial purpose intended to do so. In such case, however, the intent is shown by the person's actions. In order for that person to have obtained a water right under the constitutional method of appropriation, there did not also have to be evidence showing that when the person applied the water to a beneficial use, he or she intended to do so.

We have mentioned an intent to apply water to a beneficial use when discussing the permit method of appropriation. For example, in *Sarret v. Hunter*, 32 Idaho 536, 541-42, 185 P. 1072, 1074 (1919) (citation omitted), we stated:

> In determining whether a valid appropriation of water has been made, or the respective priorities of contending appropriators, the law does not concern itself with disputes relative to the title to the lands for which it is claimed the water was appropriated. The test of a valid appropriation of water is its diversion from the natural source and its application to a beneficial use. When one diverts water hitherto unappropriated and applies it to a beneficial use, his appropriation is complete, and he acquires a right to the use of such water, which is at least coextensive with his possession, and so when one makes application for a permit to divert and appropriate water, the query is, not upon whose lands does he intend to apply it, but upon what lands he intends to apply it, and to what use does he expect to put it when so applied. His right to possession, or the character of his occupancy as between claimants to the right to the use of the public waters of the state, is not in issue.

An intent to apply the water to a beneficial use was relevant when making an application for a permit. At the time *Sarret v. Hunter* was decided, that application was made to the state engineer. The application for the permit had to set forth "the nature of the proposed use." Rev. Codes of Idaho § 3253 (1908). The engineer could issue a permit if the application "contemplate[d] the application of water to a beneficial use." Rev. Codes of Idaho § 3254 (1908). If the application did not indicate an intent to apply the water to a beneficial use, the state engineer would not issue a permit. If a permit was issued, the applicant then had to timely complete the diversion works and apply the water to a beneficial use. "After the holder of a permit has fulfilled all the requirements of the statute, and made proof to the state engineer that he has put the water to the beneficial use for which the diversion was intended, he is entitled to a

11

license from the state engineer confirming such use." *Basinger v. Taylor*, 30 Idaho 289, 297, 164 P. 522, 524 (1917). It was the license, not the permit, that granted the water right, but the priority date related back to the date the permit was issued. *Id*; *Washington State Sugar Co. v. Goodrich*, 27 Idaho 26, 147 P. 1073 (1915).

Under the constitutional method of appropriation, a water user could make a valid appropriation without a permit by diverting the water and putting it to beneficial use. *State v. U.S.*, 134 Idaho 106, 996 P.2d 806 (2000). Because no diversion is required in order to obtain a water right for stock watering under the constitutional method, *Id*., Joyce Livestock's predecessors could obtain water rights for stock watering simply by applying the water to a beneficial use, which they did by watering their stock.

The United States asks us to require a mental element in this situation because without it "a livestock grazer could appropriate a water right without actually being aware of the fact." From its arguments, the mental element that the United States would require includes two aspects. First, there would have to be evidence showing that the rancher grazing livestock on public land knew of the water sources on the land and knew that his or her livestock were drinking from those water sources. Second, there would have to be evidence showing that the rancher understood or believed that a water right recognized by law could be obtained by the instream watering of livestock.

With respect to the first aspect, the early settlers to this area could obtain homesteads of 160 or 640 acres, depending upon when they made entry on the federal lands. The Homestead Act of 1862 authorized the entry of 160 acres, and it was amended in 1891 to permit the entry of 640 acres. The Stock-Raising Homestead Act enacted in 1916 permitted the entry of 640 acres. Regardless of whether the settler obtained a patent to 160 acres or 640 acres, the patented property alone was not sufficient to sustain a livestock operation capable of supporting a single family unit in this arid part of the country. Livestock must have adequate forage and water. To succeed, the rancher had to use adjoining or nearby public lands and the water on those lands. The demand for water in this arid region was greater than the supply. The argument of the United States assumes that these ranchers would have acquired a homestead and several hundred head of livestock without first making any investigation to see whether there was sufficient forage and water to support those livestock. In other words, the government's argument assumes that these ranchers lacked common sense. It is inconceivable that a rancher would either

12

homestead or purchase land and invest in hundreds of head of livestock without having made any investigation as to whether there was sufficient water available for the livestock to survive. The rancher's hope was to raise horses, cattle, or sheep for market, not to have them die from lack of water. When putting livestock out onto the range, the rancher clearly wanted them to drink water from the available water sources.

With respect to the second aspect, we have never held that in order to obtain a valid water right under the constitutional method of appropriation there must have been evidence showing that the appropriator understood that the manner in which he or she was securing and using the water would ultimately be recognized under the law as creating a valid water right. We have never required appropriators to be lawyers or seers. Water rights based upon prior appropriation were recognized by custom in the land that later became the State of Idaho before there were any statutes or controlling court decisions on the issue.

The doctrine of prior appropriation grew out of the sense of justice of the miners who came to the west in search of gold and other precious metals. *Atchison v. Peterson*, 87 U.S. 507 (1874). Congress first recognized the doctrine in 1866. *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935). It was not until 1881 that the legislature of the Idaho Territory first enacted legislation concerning the appropriation of water. *Kirk v. Bartholomew*, 3 Idaho 367, 29 P. 40 (1892). The Supreme Court of the Territory of Idaho first recognized the doctrine of prior appropriation in 1888. *Malad Valley Irrigation Co. v. Campbell*, 2 Idaho 378, 18 P. 52 (1888). Yet, we have recognized a water right with a priority date of 1864, *Hillcrest Irrigation Dist. v. Nampa & Meridian Irrigation Dist.*, 57 Idaho 403, 66 P.2d 115 (1937), which would have been obtained before there were any statutes or court decisions recognizing the doctrine of prior appropriation in what became Idaho.

"It should be noted that a 'constitutional appropriation' is not pursuant to specific procedures specified by the constitution, but instead is allowed by the grant of authority of the constitutional language." *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000). It was not until 1974 that we addressed whether diversion was required in order to appropriate water under the constitutional method. *State, Dep't of Parks v. Idaho Dep't of Water Admin.*, 96 Idaho 440, 530 P.2d 924 (1974). It was not until 2000 that we held that a water right could be obtained for stock watering without diverting the water from the watercourse. *State v. U.S.*, 134 Idaho 106, 996 P.2d 806 (2000). Adopting the intent element urged by the United States would result

in a holding that no water rights for instream stock watering could have been obtained before those cases were decided unless the court also found that those watering their stock at the water source decades ago were sufficiently prescient to have known how we would decide those cases. It could also affect the priorities of water rights originally obtained under the constitutional method of appropriation if the original appropriator is no longer available to testify as to his or her understanding of water law.

**4. The water rights that ranchers obtained by watering their livestock on federal land were appurtenant to their patented properties.** The district court held that the water rights obtained by Joyce Livestock's predecessors on federal grazing land were appurtenant to their patented properties. The district court reasoned, "[M]any livestock owners nonetheless depended on the use of adjacent public rangeland in conjunction with their patented property to support a viable livestock operation. . . . It can be reasonably concluded that both the rangeland as well as the water right benefited the livestock owners patented property." In seeking to have that holding reversed, the United States argues, "[A]n instream stock water right appropriated on a public grazing allotment has no physical relationship to base property and cannot be an appurtenance to it in any recognized sense." We have not held, however, that appurtenance is dependent upon a "physical relationship" as contended by the United States.

In *Nelson v. Johnson*, 106 Idaho 385, 679 P.2d 662 (1984), the Wakes owned real property that they used for a dry farming operation and a cattle ranch. Each year they would drive their cattle from the home ranch down a county road and then over an access road on their farmland to Butler Springs, also located on their land. The cattle would then graze on adjacent federal land, returning each day to the springs for water. At the onset of winter, the Wakes drove their cattle back along the same route to winter on their home ranch.

In 1956 the Wakes sold the farmland to the Hesses and reserved water rights in Butler Springs and an easement in the land surrounding the springs. They did not reserve an easement in the access road that ran from the county road to the springs. Several years later, the Hesses sold the farmland to the Johnsons.

In 1964 the Wakes sold their home ranch and cattle operation. After several mesne conveyances, the Nelsons purchased the cattle ranch in 1973. In 1979 the Johnsons prevented

the Nelsons from using the access road to the Butler Springs area, and the Nelsons filed suit to enforce their right to use the access road and the area around the springs.

In defending the lawsuit, the Johnsons contended that the easement in the land surrounding Butler Springs was not appurtenant to the ranch property and therefore did not pass with the ranch property when it was conveyed to the Nelsons. The trial court held that the easement around Butler Springs reserved by the Wakes in 1956 when they sold the farmland was appurtenant to the ranch property and therefore passed with it in the subsequent conveyances of the ranch property. This Court affirmed, reasoning as follows:

> The definitions of "appurtenant" and "in gross" further make it clear that the easement is appurtenant. The primary distinction between an easement in gross and an easement appurtenant is that in the latter there is, and in the former there is not, a dominant estate to which the easement is attached. An easement in gross is merely a personal interest in the land of another, whereas an easement appurtenant is an interest which is annexed to the possession of the dominant tenement and passes with it. An appurtenant easement must bear some relation to the use of the dominant estate and is incapable of existence separate from it; any attempted severance from the dominant estate must fail. The easement in the Butler Springs area is a beneficial and useful adjunct of the cattle ranch, and it would be of little use apart from the operations of the ranch. Moreover, in case of doubt, the weight of authority holds that the easement should be presumed appurtenant. Accordingly, the decision of the trial court is affirmed as to the reserved easement.

106 Idaho at 387-88, 679 P.2d at 664-665 (citations omitted).

When deciding that a water right passes with the property to which it is appurtenant even though not mentioned in the deed, we reasoned by analogy from the law applicable to easements. In *Bothwell v. Keefer*, 53 Idaho 658, 27 P.2d 65 (1933), the issue was whether an attachment of real property which had an appurtenant water right created a lien on the water right when the water right was not mentioned in the writ of attachment. We held that an appurtenant water right passed with the land even though not expressly mentioned. In doing so, we reasoned by analogy from appurtenant easements, holding that water rights and easements were sufficiently similar to have the relevant law applicable to appurtenant easements apply to appurtenant water rights.

> This court has held, construing the Shannon Case [*Cooper v. Shannon*, 85 P. 175 (Colo. 1906)], that a water right passes with the realty to which it is appurtenant unless there is intention to the contrary, and easements pass with the realty, concerning which this court has held the following: "And the general rule is that, where an easement is annexed to land, either by grant or prescription, it

15

> passes as an appurtenance with the conveyance 'of the dominant estate, although not specifically mentioned' in the deed, or even without the use of the term 'appurtenances,' 'unless expressly reserved from the operation of the grant.'"
>
> Conceding that an easement is different from a water right, water rights and appliances connected therewith have been considered, so far as the point here is concerned sufficiently similar to easements, to pass with the land though not mentioned as such or as appurtenances.

53 Idaho 662, 27 P.2d at 66-67 (citations omitted).

Like the easement around Butler Springs in *Nelson v. Johnson*, the water rights on public lands obtained by the predecessors of Joyce Livestock were beneficial and useful adjuncts to their cattle ranches and would be of little use apart from the operations of their ranches. Indeed, the patented property alone was not sufficient to sustain a livestock operation capable of supporting a single family unit in this arid part of the country. Also, those water rights would be of little use independent of the ranch properties. It would be illogical to hold that an easement on the land surrounding a spring can be appurtenant to the cattle ranch as in *Nelson v. Johnson*, but that a water right in that spring cannot be appurtenant because the water is not used on the ranch. The sole purpose of the easement on the land surrounding the springs in *Nelson v. Johnson* was to permit the cattle to congregate there in order to drink water from the springs. We therefore hold that the district court did not err in holding that the water rights on federal land acquired by the predecessors of Joyce Livestock were appurtenant to their deeded ranches.

**5. A water right appurtenant to real property is conveyed with the real property unless it is expressly reserved or the parties clearly intended that the conveyance not include the water right.** The district court held that predecessors of Joyce Livestock had stockwater rights on federal land that were appurtenant to their deeded properties. The court also held that whether those appurtenant water rights passed with the land when it was conveyed depended upon the intent of the grantor. With respect to proof of that intent, the court stated, "Intent is evidenced by the terms of the instrument conveying the land, or, when the instrument is silent or ambiguous, then by other facts and circumstances surrounding the conveyance." The district court then conducted an analysis of the documents in the record to determine whether the grantors intended to convey appurtenant water rights with the land when the water rights were not mentioned in the deeds. In doing so, the district court erred.

16

Unless they are expressly reserved in the deed or it is clearly shown that the parties intended that the grantor would reserve them, appurtenant water rights pass with the land even though they are not mentioned in the deed and the deed does not mention "appurtenances." *Silverstein v. Carlson*, 118 Idaho 456, 797 P.2d 856 (1990); *Bothwell v. Keefer*, 53 Idaho 658, 27 P.2d 65 (1933). Thus, the inquiry is not whether there is evidence indicating that the grantor intended to convey the water rights with the land. Rather, the inquiry is whether the water rights were expressly reserved in the deed conveying the land or whether there is clear evidence that the parties intended that the grantor would reserve them. There is nothing in the record indicating that any of Joyce Livestock's predecessors in interest intended to reserve their water rights on public land when they conveyed their ranches. Therefore, the conveyances of the land included the appurtenant water rights.

The United States argues that the statute of frauds prevents a conveyance of water rights unless they are expressly mentioned in the deed. It relies upon *Olson v. Idaho Department of Water Resources*, 105 Idaho 98, 666 P.2d 188 (1983); *Gard v. Thompson*, 21 Idaho 485, 123 P. 497 (1912); and *Russell v. Irish*, 20 Idaho 194, 118 P. 501 (1911). None of those cases support the position of the United States.

The *Olson* case held that an executory oral agreement to settle a lawsuit by changing priority dates and amounts of use of the parties' water rights was within the statute of frauds. The *Gard* case held that merely handing water permits to another person with no intention to pass title did not constitute a conveyance of the water rights represented by the permits. The *Russell* case held that a conveyance of land included the appurtenant water rights even though they were not specifically mentioned in the deed.

The deeds executed by Joyce Livestock's predecessors conveyed the land and, under the law, any appurtenances including water rights. No separate writing or express mention of the water rights was required by the statute of frauds. A separate writing would be required if there had been an attempt to convey the water rights separately.

**B. Did the District Court Err in Determining the Priority Date of Joyce Livestock's Water Right?**

Joyce Livestock claimed twenty different places of use along Jordan Creek. The district court determined that the earliest priority would be April 26, 1935, the date that a predecessor-in-

interest John T. Shea applied for a grazing permit under the Taylor Grazing Act. In making that determination, the district court held that it would not recognize any earlier priority absent an historical document acknowledging the existence of the water rights or showing where cattle were grazed.

On April 26, 1935, Shea applied for a grazing permit under the Taylor Grazing Act, which had been enacted the preceding year. In that application, he stated that he had been grazing specified areas of federal rangeland for ten years. Likewise, on June 12, 1935, Joyce Bros. Livestock Co. submitted an application for a grazing permit on federal rangeland. In that application, it stated that it began using that rangeland in 1866. The district court held that because these applications for grazing permits did not state that Shea and Joyce Bros. Livestock Co. believed they had water rights on the federal rangeland, they could not have had any such water rights. The court held, however, that they did obtain water rights by grazing their livestock on that same rangeland pursuant to the grazing permits subsequently issued. In making this determination, the district court erred in several respects.

First, it held that it would not recognize instream water rights on federal rangeland unless the applications for grazing permits identified those water rights. These predecessors of Joyce Livestock filed applications for grazing permits, not applications for water rights. The federal government could not grant water rights under the applicable law.

Second, the district court apparently construed certain answers on the applications as disclaiming any water rights on federal rangeland. The application completed by Shea included a question asking, "Do you own or control any source of water supply needed or used for livestock purposes? Describe it?" Shea answered, "Usual water right acquired with lands under the laws of Idaho." The district court upheld the special master's finding that Shea's answer referred to water sources on his deeded land. Based upon that interpretation, the district court held that Shea's answer indicated he did not believe he owned any water rights on federal rangeland, and therefore he could not have intended to convey any such water rights. The identical question was included on the application completed by Joyce Bros. Livestock Co., and the answer did not identify any water rights on federal land. The district court likewise concluded that Joyce Bros. Livestock Co. therefore did not have any water rights on federal land when it made the application.

18

The question did not ask whether the applicant for a grazing permit claimed any water rights on federal land. It asked him whether the applicant owned or controlled any source of water needed or used for livestock purposes. A water right does not make the appropriator the owner of the source of water, nor does it give the appropriator control over that source. *Hutchinson v. Watson Slough Ditch Co.*, 16 Idaho 484, 101 P. 1059 (1909) (the right to divert all of the water out of a watercourse during the irrigation season does not make the appropriator the sole and exclusive owner of the watercourse). It does not even make the appropriator the owner of the water. We have long recognized that an appropriator may not waste water, but must permit others to use the water when the appropriator is not applying it to a beneficial use. *Hall v. Blackman*, 8 Idaho 272, 68 P. 19 (1902) (although the owner of real estate need not make or allow any use of the land, an appropriator cannot waste the water but must permit others to use it when the appropriator is not applying it to a beneficial use). A water right simply gives the appropriator the right to the use of the water from that source, which right is superior to that of later appropriators when there is a shortage of water.

The abandonment of water rights requires both the intent to abandon and the actual surrender or relinquishment of the water rights. *Sears v. Berryman*, 101 Idaho 843, 623 P.2d 455 (1981). "The intent to abandon a water right must be evidenced by clear, unequivocal and decisive acts and mere non-use is not per se abandonment." *Id.* at 847, 623 P.2d at 459. Nothing in the grazing applications states that the failure to list all water rights claimed will constitute an abandonment of the water rights. The failure to list a water right in the application for a grazing permit would not constitute clear and unequivocal evidence of an intent to abandon the omitted water right, nor would it show non-use of the water right.

Third, the district court failed to give consideration to the fact that at least Shea was issued Class 1 grazing rights. The significance of Class 1 grazing rights was explained by the United States Supreme Court in *Public Lands Council v. Babbitt*, 529 U.S. 728, 734 (2000) (emphasis theirs). "The rules [for allocating grazing privileges under the Taylor Grazing Act] consequently gave a first preference to owners of stock who also owned 'base property,' *i.e.,* private land (or water rights) sufficient to support their herds, *and* who had grazed the public range during the five years just prior to the Taylor Act's enactment." A Class 1 permit could have been issued to Shea only if he had been grazing the public range for at least five years prior to the enactment of the Taylor Grazing Act in 1934.

19

Any water rights obtained by Joyce Livestock's predecessors must be based upon their application of the water to a beneficial use by grazing livestock where they would have access to the water sources at issue. Their water rights are not based upon whether or not there are historical documents indicating that they claimed or believed they had acquired water rights. Their claim was not based upon the permit system of obtaining a water right but upon the constitutional method of appropriation.

The district court was correct in holding that it must examine where the individual predecessors grazed their livestock when determining whether they had acquired any water rights. When purchasing the various parcels of land and their appurtenant water rights, Joyce Livestock could acquire no greater water rights than the grantor had. *Beecher v. Cassia Creek Irrigation Co.*, 66 Idaho 1, 154 P.2d 507 (1944).

Because the district court erred in its analysis of Joyce Livestock's priority, we vacate that part of the judgment and remand this case for a redetermination of priority in a manner consistent with this opinion.


**C. Did the District Court Err in Denying Joyce Livestock's Request for an Award of Attorney Fees under Idaho Code § 12-121 and 28 U.S.C. § 2412(d)?**

The district court found that Joyce Livestock was the prevailing party in this litigation. Joyce Livestock requested an award of attorney fees against the United States pursuant to Idaho Code § 12-121 and 28 U.S.C. § 2412(d). The district court denied the requested award under § 12-121 on the ground that the United States did not assert a claim or defense frivolously, unreasonably, or without foundation. The district stated that there were two issues of first impression: whether the administration of grazing allotments on federal land was sufficient to support the claim of the United States to an instream appropriation of water and whether instream water rights obtained by ranchers on federal land were appurtenant to the ranchers' deeded properties. The district court stated, "The 'bottom-line' in this matter is that the issues pertaining to the ownership of stockwater rights on the public domain are not well settled. . . . Additionally, the resolution of these issues is conflicting among other states." The district court also denied the request for an award of attorney fees pursuant to 28 U.S.C. § 2412(d). It held that the position of the United States in this litigation was substantially justified in that it had a reasonable basis in law and fact. Based upon that finding, the district court declined to address

20

whether 28 U.S.C. § 2412(d) authorized state courts to award attorney fees.  Joyce Livestock asserts on appeal that the district court erred in denying its request for an award of attorney fees.

"An award of attorney fees under Idaho Code § 12-121 is not a matter of right to the prevailing party, but is appropriate only when the court, in its discretion, is left with the abiding belief that the case was brought, pursued, or defended frivolously, unreasonably, or without foundation."  *McGrew v. McGrew*, 139 Idaho 551, 562, 82 P.3d 833, 844 (2003).  "If there is a legitimate, triable issue of fact or a legitimate issue of law, attorney fees may not be awarded under this statute even though the losing party has asserted factual or legal claims that are frivolous, unreasonable, or without foundation."  *Thomas v. Madsen*, 142 Idaho 635, 639, 132 P.3d 392, 396 (2006).

There was at least one legitimate issue of law presented in this case.  We had not previously addressed whether instream water rights in water sources not located on the appropriator's land could be appurtenant to the appropriator's real property.  The district court therefore did not err in denying Joyce Livestock's request for attorney fees under Idaho Code § 12-121.

Joyce Livestock also challenges the district court's denial of its request for an award of attorney fees pursuant to subsection (d) of 28 U.S.C. § 2412, which provides:

> (1)(A)  Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

Joyce Livestock argues that the statute permits "any court having jurisdiction of the action" to award attorney fees and the district court had jurisdiction over the United States pursuant to the McCarran Amendment, 43 U.S.C. § 666.  The United States argues that the statute does not constitute a waiver of sovereign immunity permitting state courts to award attorney fees against the United States.  The United States Supreme Court has not addressed the issue of whether the statute applies to litigation in state courts.

"There is no doubt that waivers of federal sovereign immunity must be 'unequivocally expressed' in the statutory text."  *United States v. Idaho Dept. of Water Resources*, 508 U.S. 1, 6

(1993). In *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573 (1946), the United States Supreme Court held that a Utah statute authorizing actions to recover taxes to be brought against the state "in any court of competent jurisdiction" did not include federal courts. In so holding, the Court noted that a clear indication of a state's consent to suit against itself in federal court is required because of the direct impact such litigation upon the state's finances. Although the *Kennecott* case dealt with a state's waiver of sovereign immunity, such waiver is closely analogous to the federal government's waiver of sovereign immunity. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999).

The statute at issue is part of the Equal Access to Justice Act (EAJA). "The EAJA renders the United States for attorney's fees for which it would not otherwise be liable, and thus amounts to a partial waiver of sovereign immunity. Any such waiver must be strictly construed in favor of the United States." *Ardestani v. Immigration and Naturalization Service*, 502 U.S. 129, 137 (1991). The EAJA states, "'[C]ourt' includes the United States Court of Federal Claims and the United States Court of Appeals for Veterans Claims." 28 U.S.C. § 2412(d)(2)(F). Had the Congress intended that the word "court" also include state courts, it undoubtedly would have expressly included them. Since the EAJA involves a partial waiver of sovereign immunity by the United States, it is much more unlikely that the word court would be construed to include state courts than it is that it would be construed to include the United States Court of Federal Claims and the United States Court of Appeals for Veterans Claims. If Congress had intended that state courts also be included, it certainly would also have included a specific reference to them. We therefore hold that 28 U.S.C. § 2412(d) does not authorize state courts to award attorney fees against the United States. We affirm the district court's denial of Joyce Livestock's request for an award of attorney fees under that statute.

**D. Did the District Court Err in Denying the United States's Claim for a Water Right for Watering Stock?**

The United States claimed instream water rights for stock watering based upon its ownership and control of the public lands coupled with the Bureau of Land Management's comprehensive management of public lands under the Taylor Grazing Act. The district court held that such conduct did not constitute application of the water to a beneficial use, and denied the claimed water rights. The United States appealed that ruling.

Under the constitutional method of appropriation, "a water user could make a valid appropriation without a permit, most commonly by diverting the water and putting it to beneficial use." *State v. U.S.*, 134 Idaho 106, 111, 996 P.2d 806, 811 (2000). Because no diversion is required in order to obtain a water right for stock watering under the constitutional method, *Id.*, the United States could obtain water rights for stock watering simply by applying the water to a beneficial use. Whether by implied license, *Buford v. Houtz*, 133 U.S. 320 (1890), or express permission after the enactment of the Taylor Grazing Act, the United States has permitted ranchers to graze their livestock on public lands. The United States has not, however, used any of the water at issue to water its livestock. Under Idaho law, a landowner does not own a water right obtained by an appropriator using the land with the landowner's permission unless the appropriator was acting as agent of the owner in obtaining that water right.

> This court has repeatedly held that a water right is not necessarily appurtenant to the land on which it is used and may be separated from it, and this is the general rule.
> If the water right was initiated by the lessee, the right is the lessee's property, unless the lessee was acting as the agent of the owner.

*First Security Bank of Blackfoot v. State*, 49 Idaho 740, 746, 291 P. 1064, 1065 (1930). The United States does not contend that any of the ranchers who obtained the water rights at issue did so as an agent of the United States. The Taylor Grazing Act expressly recognizes that the ranchers could obtain their own water rights on federal land. The United States seeks to distinguish *First Security Bank of Blackfoot v. State* on the ground that the appropriator in that case was a tenant while the ranchers in this case were licensees. That is a distinction without a difference.

Under Idaho law, an appropriator need not have a possessory interest in the land upon which the water source is located in order to obtain a water right. "[I]n this state one may have a valid appropriation though only a temporary and revocable way of conveyance for his water; diversion and application to a beneficial use being the two essentials." *Morgan v. Udy*, 58 Idaho 670, 680, 79 P.2d 295, 299 (1938). The limitation is that a water right cannot be initiated by trespass upon private property. *Lemmon v. Hardy*, 95 Idaho 778, 519 P.2d 1168 (1974).

The United States cites Idaho Code § 42-501 in support of its argument that it acquired water rights in the water sources on the federal land at issue in this case. That statute, enacted in

1939,[3] permits the Bureau of Land Management to "appropriate for the purpose of watering livestock any water not otherwise appropriated, on the public domain" by using the permit procedure for obtaining a water right. The United States does not contend that it attempted to obtain any water rights by complying with the statute. Rather, it argues that if it could have obtained a water right under the statute without actually using any of the water, it should also be able to do so under the constitutional method of appropriation.

The constitutional method of appropriation requires that the appropriator actually apply the water to a beneficial use. *Sarret v. Hunter*, 32 Idaho 536, 541, 185 P. 1072, 1074 (1919); *Reno v. Richards*, 32 Idaho 1, 178 P. 81 (1918). If that use is stock watering, then the appropriator must actually water stock. The constitutional method of appropriation and the permit method were two separate means for acquiring water rights. A statute creating a procedure for obtaining a water right under the permit system does not amend the constitutional method for obtaining a water right.

In *State v. U.S.*, 134 Idaho 106, 996 P.2d 806 (2000), the United States claimed a nondiversionary water right for wildlife habitat under the constitutional method of appropriation. It based its claim upon our opinion in *State, Department of Parks v. Idaho Department of Water Administration*, 96 Idaho 440, 530 P.2d 924 (1974), where we upheld the ability of the Department of Parks to comply with a statute directing it to utilize the permit process to appropriate the unappropriated natural spring flow of Malad Canyon for scenic beauty and recreation without having to make a physical diversion of the water. We held that our opinion in

---

[3] As enacted in 1939, the statute provided:

> The division of grazing of the department of Interior of the United States may appropriate for the purpose of watering livestock any water not otherwise appropriated, on the public domain. The department of Reclamation shall, upon application in such form and of such content as it shall by rule prescribe issue permit and license and certificate of water right within a reasonable time in such form as it shall prescribe for such appropriation. With each such application there shall be paid to the department of Reclamation a fee of one dollar and there shall be no further fee required for the issuance of the permit or license and certificate of water right, nor for any other proceedings in connection with such application. Such permit, license and certificate of water right shall be conditioned that the water appropriated shall never be utilized thereunder for any purpose other than the watering of livestock without charge therefore on the public domain. The maximum flow for which permit, license and certificate of water right may issue hereunder shall be five miner's inches, and the maximum storage for which permit, license and certificate of water right may issue hereunder shall be fifteen acre feet in any one storage reservoir.

Ch 205, § 1, 1939 Idaho Sess. Laws 412, 413. The statute was amended in 1971 to change the "division of grazing" to the "bureau of land management," to change the "department of reclamation" to the "department of water administration," and to set the application fee at $10.00. Ch. 152, § 1, 1971 Idaho Sess. Laws 752.

24

the *State, Department of Parks* case did not support the claimed constitutional appropriation because the water right at issue there was made pursuant to the permit system of appropriation, not the constitutional method. "The limited public purpose exception stated in *State, Department of Parks* does not support the United States' claim because it applies only to appropriations made under Idaho's permit system." 134 Idaho at 112, 996 P.2d at 812. We concluded, "The United States has not requested, pursuant to I.C. § 42-1504, that the Idaho Water Resource Board file an application for appropriating a minimum streamflow for Smith Springs. Therefore, the limited public purpose exception does not apply to its claim." *Id.*

The same reasoning applies here. The United States has not sought a water right pursuant to Idaho Code § 42-501. Rather, it bases its claim upon the constitutional method of appropriation. That method requires that the appropriator actually apply the water to a beneficial use. Since the United States has not done so, the district court did not err in denying its claimed water rights.

The United States contends that the denial of its claimed water rights conflicts with the Taylor Grazing Act and any requirement of state law that it actually apply the water to a beneficial use is invalid under the Supremacy Clause of the Constitution of the United States. The United States does not point to any provision of the Taylor Grazing Act allegedly in conflict with Idaho water law. Rather, it claims that application of Idaho water law to it would violate the purposes underlying the Act. It argues,

> Recognition of a private appropriative water right to take water from streams on public lands in the course of grazing would likewise effectively lead to monopoly of federal grazing and interfere with federal administration of the lands unless the ability of others to graze there under permit by BLM under the Taylor Grazing Act is preserved through a decree of stock water rights to BLM that could be used by common and future permittees.

The argument of the United States reflects a misunderstanding of water law.

A water right does not constitute the ownership of the water; it is simply a right to use the water to apply it to a beneficial use. *Idaho Conservation League, Inc. v. State*, 128 Idaho 155, 911 P.2d 748 (1995). "In the absence of a beneficial use, actual or at least potential, a water right can have no existence." *Strong v. Twin Falls Canal Co.*, 44 Idaho 427, 434, 258 P. 173, 175 (1927). A person who is not applying the water to a beneficial purpose cannot waste it or exclude others from using it. *Hall v. Blackman*, 8 Idaho 272, 68 P. 19 (1902). Ownership of a

25

water right does not include the right to trespass upon the land of another in order to access the water. *Branson v. Miracle*, 107 Idaho 221, 227, 687 P.2d 1348 (1984). Indeed, Idaho law could not authorize anyone to trespass upon federal land. Joyce Livestock cannot water its livestock at water sources located on federal rangeland unless the government grants it permission to have its livestock on such land. It also cannot transfer the place of use of the water without first obtaining permission after following the required statutory procedure. *First Sec. Bank of Blackfoot v. State*, 49 Idaho 740, 291 P. 1064 (1930); I.C. § 42-108.

Other than making the assertion, the United States has been unable to explain how denying its claim or affirming the water rights of Joyce Livestock will in any way lead to a monopoly of the federal rangelands. As the United States has held, Congress has severed the ownership of federal lands from the ownership of water rights in nonnavigable waters located on such lands. *Ickes v. Fox*, 300 U.S. 82, 95 (1937); *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 161 (1935). Joyce Livestock's ownership of water rights in water sources located on federal rangeland would not give Joyce Livestock a possessory interest in the rangeland. It does not give Joyce Livestock ownership or control of the water sources. *Hutchinson v. Watson Slough Ditch Co.*, 16 Idaho 484, 101 P. 1059 (1909). Such water rights would not give Joyce Livestock the right to interfere with the government's administration of the rangeland, nor would it give Joyce Livestock the right to exclude from that rangeland others who had been granted permission by the government to be there.

**E. Is Joyce Livestock Entitled to an Award of Attorney Fees on Appeal?**

Joyce Livestock seeks an award of attorney fees on appeal pursuant to Idaho Code § 12-121 and 28 U.S.C. § 2412(d). As we have held, the latter statute does not authorize state courts to award attorney fees against the United States.

Attorney fees can be awarded on appeal under Idaho Code § 12-121 only if the appeal was brought or defended frivolously, unreasonably, or without foundation. *Gustaves v. Gustaves*, 138 Idaho 64, 57 P.3d 775 (2002). If there is a legitimate issue presented by the appeal, attorney fees cannot be awarded under this statute. *Lamprecht v. Jordan*, 139 Idaho 182, 75 P.3d 743 (2003); *D & M Country Estates Homeowners Ass'n v. Romriell*, 138 Idaho 160, 59 P.3d 965 (2002). The United States has presented a legitimate issue of whether water rights on federal rangeland can be appurtenant to real property owned by the appropriator. We had not

previously addressed that issue. We therefore deny Joyce Livestock's request for an award of attorney fees on appeal.

## IV. CONCLUSION

We affirm the judgment of the district court holding that Joyce Livestock has established a water right, disallowing the water right claims of the United States, and denying Joyce Livestock's request for an award of attorney fees. We vacate the district court's determination of the priority date(s) of Joyce Livestock's water rights and remand this case for redetermination of such priority date(s) in a manner consistent with this opinion. We deny Joyce Livestock's request for an award of attorney fees on appeal.

Chief Justice SCHROEDER, and Justices TROUT, BURDICK and JONES **CONCUR**.